OPINION OF THE COURT
Kaye, J.
 These six appeals involving prison disciplinary hearings put before us the question whether, consistent with the State law requirement of "substantial evidence” for administrative determinations and the Federal constitutional requirement of due process, written misbehavior reports can serve as the evidentiary basis for determinations that inmates violated institutional rules. We answer that question in the affirmative. In the circumstances presented, the disciplinary determinations satisfy both State and Federal requirements.
The facts with respect to the six determinations are summarized below.
SAUL VEGA
On September 23,1983, after a superintendent’s hearing at Attica Correctional Facility, respondent Vega was found guilty of violating an institutional rule prohibiting possession of "contraband classified as a weapon,” and committed for 30 days to a Special Housing Unit. This determination was based on a misbehavior report dated September 16, 1983 and delivered to Vega the following day, signed by Correction Officer Stelmaszyk, indorsed by two other employee witnesses and "initialed” by Sergeant Charlanow. According to the report, Stelmaszyk was checking Vega’s personal property with a metal detector, incident to his transfer to a Special Housing Unit, when he received a reading that there was metal in Vega’s Bible. The officer found half a razor blade stuck deeply between the pages, and then the other half embedded in the binding between two pages.
*134 On September 22, Vega met with a correction counselor (an "assistant”)[1] assigned to assist him with respect to the hearing, and requested no witnesses. At the hearing held the following day Vega was advised about the procedure, including the fact that he could have witnesses on his behalf, and the misbehavior report was then read to him. When asked if he admitted or denied the charge, Vega responded "Oh, I deny,” and said he had nothing further to say. He asked for no witnesses to be called. Vega was found guilty of the charge and the penalty was imposed.
Vega’s habeas corpus petition was dismissed on the ground that the written report constituted substantial evidence in support of the disposition, but the Appellate Division, after converting the proceeding to one under article 78, reversed and granted the petition.
JOSEPH CORCORAN
After a superintendent’s hearing at Attica, by determination dated October 7, 1983, respondent Corcoran was found guilty of violating institutional rules in that he refused to obey a direct order and failed to comply with count procedures. The penalty imposed was 60 days keeplock, loss of privileges, and 60 days loss of good time. The determination was based on a misbehavior report dated October 4, 1983 and delivered to Corcoran the next day, signed by Correction Officer Knapp, indorsed by one employee witness and initialed by Sergeant Ellsworth. According to Knapp, when taking a head count he found Corcoran in bed, ordered him to stand for the count, and Corcoran refused.
Corcoran refused the assignment of an assistant in preparation for the hearing. At the hearing October 7, Corcoran was advised about the procedure, including the fact that he could have witnesses on his behalf, but said he did not wish to call any. After Knapp’s misbehavior report was read Corcoran pleaded not guilty, adding that he was never given a direct order: "So, its my word against the officer’s word. I say I stood for the count, they say I didn’t. I’m not guilty.” The charges were sustained and the penalty imposed.
*135 Relying on its decision in Vega, Supreme Court dismissed Corcoran’s habeas corpus petition challenging the determination. The Appellate Division converted the proceeding to one under article 78, reversed and granted the petition, concluding there was no substantial evidence to support the determination.
BROTHER ANDRE PORTER
As the result of a disciplinary hearing held July 19,1983 at Attica, respondent Porter was found guilty of violating institutional rules prohibiting refusal to obey a direct order, to obey all posted rules and regulations, and to produce his ID card, and penalized 25 days confinement without privileges. The determination was based upon a misbehavior report dated July 17, 1983 and delivered to Porter the next day, signed by Correction Officer Donaldson and initialed by Sergeant "VJK.” According to the report, while escorting a company back from the mess hall, Donaldson saw and heard Porter make an obscene comment, whereupon he requested his ID card. Porter twice refused, and refused to give his cell block or step to the back of the company. Donaldson followed Porter to his cell, again asked for his ID card, and was again refused. Porter refused the aid of an assistant in preparation for the hearing. At the hearing, he was advised about the procedure, including the fact that he could have witnesses on his behalf, but he asked for no witnesses to be called. He pleaded not guilty and denied the substance of the report, explaining that Donaldson was escorting his company back from the mess hall, stopped the line twice, got angry and requested the first 15 inmates’ ID cards —including his, which he refused to produce — and was then told by Donaldson that he would do nothing about it. The charges were sustained and the penalty imposed.
Supreme Court denied Porter’s article 78 petition finding sufficient admissions of at least part of the charges to warrant the punishment imposed. The Appellate Division reversed and granted the petition.
HANDEL SEMPER
Respondent Semper was, after a disciplinary hearing at Attica on July 21,1983, found guilty of violating institutional rules prohibiting threats, harassment and refusal to obey a direct order, and penalized 20 days keeplock without privileges. The determination was based on a misbehavior report dated July 18 and delivered to Semper the next day, signed by Correction Officer S. Rissinger, indorsed by two employee witnesses and initialed by a Sergeant. According to the report, while returning to vocational *136 school Semper refused Kissinger’s order to keep up with the company and, when the officer spoke with him about lagging behind Semper responded with obscenities and told the officer to take him back to the block (which was done). Semper, en route, squared off in a fighting stance, put up his arms, and threatened to hit the officer. Ultimately Semper complied with the order to put down his hands and return to the block, threatening along the way.
Semper refused the assignment of an assistant in preparation for the hearing. At the hearing he was advised about the procedure, including the fact that he could have witnesses on his behalf, but requested none. Semper pleaded not guilty, contending that he had complied with Kissinger’s directions, that Kissinger accused him falsely of going back to the block or refusing to go to school, and that they began arguing — a continuation of the fact that Kissinger had been "on [his] case” for days. Semper acknowledged raising his hands as they walked, but denied squaring off. The hearing officer dismissed a charge of interference, found respondent guilty of the other charges, and imposed a penalty.
Supreme Court converted respondent’s habeas corpus petition to one under article 78 and vacated the disposition, concluding that it was error to rely solely on the misbehavior report. The Appellate Division affirmed, and we granted leave to appeal.
WESLEY PRIMO
Following a disciplinary hearing on September 15, 1983, respondent Primo was found guilty of refusing to obey a direct order and interfering with an employee, and penalized 15 days confinement to cell without privileges. The determination was based on a misbehavior report dated September 10, 1983 and delivered to Primo September 12, signed by Correction Officer K. Callaghan and indorsed by two employee witnesses. According to the report, while Callaghan was attempting tó frisk him, Primo, contrary to orders, repeatedly took his hands off the wall. When Callaghan escorted him back to his cell, Primo was very loud and made an obscene comment.
Primo refused the assignment of an assistant in preparation for the hearing. At the hearing, he was advised of the procedure, including the fact that he could have witnesses on his behalf, and he pleaded not guilty. Primo contended that he did not take his hands off the wall, and although he did turn his head around several times during the frisk, he did so because there were "about 8 or 10 officers” behind him. He denied that Callaghan escorted him *137 back to his cell, and the use of profanity. At Primo’s request, the hearing officers in respondent’s presence questioned two inmate witnesses, who stated that they were not present during the frisk but saw respondent returning to his cell quietly and without escort. The hearing officers, finding the frisk had been completed, dismissed a charge of noncompliance with frisk procedures but found respondent guilty of the two other charges based on the misbehavior report and respondent’s admission that he kept turning around, and imposed the penalty.
Supreme Court granted respondent’s article 78 petition and expunged the determination. The Appellate Division affirmed, and we granted leave to appeal.
EDWARD NESMITH
By determination dated September 28,1983, respondent Nesmith after a disciplinary hearing at Attica was found guilty of refusing to obey a direct order and failure to comply with count procedures, and penalized 30 days confinement to cell without privileges. The determination was based upon a misbehavior report dated September 25,1985 and delivered to Nesmith the next day, signed by Correction Officer L. Wilson and Sergeant "PEE.” According to the report, Nesmith was in bed during morning count and refused Wilson’s order to stand for the count. At the hearing, Nesmith pleaded not guilty. He admitted he had not heard the bell and was sleeping when the officer came by his cell, but contended that when the officer shook the bars, he got up. Nesmith met prior to the hearing with a correction counselor to assist in preparation, and requested no witnesses. At the hearing, he was advised about the procedure, including his right to call witnesses. Nesmith stated that he declined to call witnesses because no one else could have seen him in his cell. The charges were sustained and the penalty imposed.
Supreme Court granted respondent’s article 78 petition and expunged the determination. The Appellate Division affirmed, and we granted leave to appeal.
In all six cases respondents claim that the disciplinary determinations cannot stand, first, because under State law the misbehavior reports do not constitute sufficient evidence for an administrative determination and, second, because the due process clause of the Federal Constitution requires the fact finder to hear testimony. Both contentions are without basis.
THE REGULATIONS IN ISSUE
Central to the resolution of these appeals is a review of the regulations governing prison disciplinary proceedings.
*138 In June 1983 the Department of Correctional Services, in a comprehensive reform, supplanted its two-tier disciplinary system with a system of three levels of hearings: Tier I, a "violation hearing” to be held when the misbehavior, if substantiated, would warrant a penalty of loss of recreation and other privileges of 13 days or less (7 NYCRR 251-2.2 [b] [1]); Tier II, a "disciplinary hearing” to be held when the misbehavior, if substantiated, would warrant a penalty of confinement to cell or loss of privileges of 30 days or less (7 NYCRR 251-2.2 [b] [2]); and Tier III, a "superintendent’s hearing”, when the penalty for the misbehavior would exceed that which may be imposed at a disciplinary hearing (7 NYCRR 251-2.2 [b] [3]). Only Tiers II and III are involved in the present appeals. According to appellant, there are approximately 72,000 Tier II and Tier III hearings annually.
Under the former regulations, an adjustment committee initially handled all disciplinary cases (see, former 7 NYCRR part 252 [repealed eff June 15,1983]). But if the adjustment committee determined that close confinement for longer than seven days was required, the matter was referred for a superintendent’s proceeding, at which the inmate was afforded the right to be apprised of the charge, and to have documentary evidence and statements of witnesses presented to the presiding officer (see, Matter of Amato v Ward, 41 NY2d 469, 473). The regulations further required the presiding officer to "interview one or more employees who witnessed or have direct knowledge of the incident” (see, former 7 NYCRR 253.4 [c] [repealed eff June 15,1983]).
The new regulations, enacted following Federal litigation (see, Powell v Ward, 392 F Supp 628, mod and affd 542 F2d 101; 487 F Supp 917, mod and affd 643 F2d 924, cert denied 454 US 832), continued many of these procedures. At both Tier II (7 NYCRR 253.3) and Tier III (7 NYCRR 254.3) inmates must be served with a formal charge in the form of a written misbehavior report, made and signed by an employee who observed the incident, describing with specificity the alleged incident and rule violated; inmates must be advised that no statement they make may be used against them in a criminal proceeding and that they are permitted to call witnesses on their behalf "provided that doing so does not jeopardize institutional safety or correctional goals” (7 NYCRR 251-3.1,251-1.4 [b]). Inmates may be permitted to select an employee from a list as an assistant, to explain the charges, interview witnesses, obtain documentary evidence or written statements and report back to the inmate (see, n 1, supra).
*139 The inmate must promptly, but no less than 24 hours following delivery of the misbehavior report, be afforded an in-person hearing (7 NYCRR 251-5.1, 253.6 [a]; 254.6 [a]) before impartial hearing officers (7 NYCRR 253.1,254.1). At the hearing, which must be recorded (7 NYCRR 253.6 [b]; 254.6 [b]), the inmate is entitled to call witnesses on his behalf, unless the presiding officer determines that their testimony is immaterial, redundant, or would jeopardize safety or institutional goals (7 NYCRR 253.5 [a]; 254.5 [a]). The officer must record any such determination and the specific reasons in writing and present it to the inmate (7 NYCRR 253.5 [a]; 254.5 [a]). Promptly following the hearing, the inmate must be given a statement in writing setting forth the disposition and, if the inmate is found guilty, the evidence relied upon and the reasons for any penalty imposed (7 NYCRR 253.7 [c]; 254.7 [c]).
The new regulations do not, however, continue the requirement that the hearing officer interview the employees who witnessed or have direct knowledge of the incident.
THE MISBEHAVIOR REPORTS HERE CONSTITUTE "SUBSTANTIAL evidence”
Viewing each record as a whole, we conclude that the misbehavior reports in all six cases formed a sufficient basis to support the disciplinary determinations.
The governing standard under State law is no longer the "legal residuum rule,” requiring some minimum quantity of admissible evidence to support an administrative determination. Rather, the question is whether the determination is supported by "substantial evidence” (see, CPLR 7803 [4]; Matter of Eagle v Paterson, 57 NY2d 831, 833; 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180). Hearsay is admissible in such a proceeding, and if sufficiently relevant and probative may constitute substantial evidence. While the quantum of evidence that rises to the level of "substantial” cannot be precisely defined, the inquiry is whether "in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs.” (National Labor Relations Bd. v Remington Rand, 94 F2d 862, 873 [Hand, J.], cert denied 304 US 576.) Put another way, substantial evidence "means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact.” (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180, supra.)
*140 We conclude that the determinations here are supported by substantial evidence. In each case, the misbehavior report describes, with specificity, an incident which the author claims to have witnessed, and the rule allegedly violated. Each report is dated the same day as the incident, signed by its author, and indorsed or initialed by one or more other correction officers. Respondents were offered, and in two of the six cases accepted, assistants to aid in their preparation for the hearing. No witnesses were requested in advance. At the hearings, each respondent was advised that he could call witnesses on his behalf. One of the six asked that witnesses be called, the others did not. Although all respondents pleaded not guilty, in each instance the response was little more than a denial of the charge. No respondent offered a defense that suggested the need for additional inquiry — for example, a showing that he had not been in the area or had not had the claimed contact with the charging officer. Vega refused to say anything in his defense, and Porter admitted that he had refused the order to produce his identification card, the infraction for which he was disciplined. Similarly, Semper and Primo confirmed facts in the misbehavior reports. In the Corcoran and Nesmith cases, the issue was simple: the officers reported they had refused to stand for the morning count, and they said they had stood. It was for the fact finder to decide whether to credit the correction officers’ statements that they refused to stand.
In such circumstances, the written reports were sufficiently relevant and probative to constitute substantial evidence supporting the determinations that respondents violated institutional rules.
FEDERAL CONSTITUTIONAL REQUIREMENTS ARE SATISFIED
Respondents next contend that disciplinary determinations based on written misbehavior reports are necessarily a denial of due process of law. Here too we conclude that respondents’ argument must fail: given the facts of each case and the procedures afforded by the applicable regulations, respondents were not denied due process.
Respondents urge that the due process requirements identified in Wolff v McDonnell (418 US 539) — that an inmate faced with loss of good time or close confinement be apprised of charges in writing and that a hearing subsequently be held on those charges —imply that correctional authorities at the hearing must present evidence to support the charges, evidence which must consist of something other than the charging document itself. But the as *141 sumption is mistaken that the hearing contemplated by Wolff requires the correction authorities to present a case, which the inmate can then probe or test. The hearing mandated by Wolff h.as a far more limited purpose: it allows an inmate facing disciplinary proceedings "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals” (Wolff v McDonnell, 418 US 539, 566, supra). There is no right of confrontation or cross-examination, and consequently no requirement that the disciplinary authority call any adverse witnesses, including the charging party, to testify at the hearing (Baxter v Palmigiano, 425 US 308, 322, and n 5; Wolff v McDonnell, 418 US 539, 567-568, supra).
Nor does due process of law require that disciplinary board members interview the officers who wrote the misbehavior reports.[2]
In determining how much process is due, we must weigh the inmate’s interest, the State’s interests, and the value of the proposed procedural requirements (Hewitt v Helms, 459 US 460, 473; Mathews v Eldridge, 424 US 319, 335). Respondents’ private interests are "of considerable importance” (Wolff v McDonnell, 418 US 539, 561, supra). Although close confinement involves only transfer "from one extremely restricted environment to an even more confined situation” (Hewitt v Helms, 459 US 460, 473, supra), at both Tier II and Tier III the inmate may face loss of good time, which could affect length of the prison term, as well as "the stigma of wrongdoing or misconduct,” which could affect parole (Hewitt v Helms, 459 US 460, 473, supra).
The State’s interests, however, are also weighty. "The operation of a correctional institution is at best an extraordinarily difficult undertaking”, and "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits” (Wolff v McDonnell, 418 US 539, 566, supra). Given the tens of thousands of Tier II and Tier III hearings held each year in New York, it obviously would impose a considerable administrative burden to require the presiding officer in each case to contact and interview the charging officer, as well as employees who witnessed or had direct knowledge of the incident (see, Richardson v Perales, 402 *142 US 389, 406; cf. Wolff v McDonnell, 418 US 539, 574, supra). Moreover, the State has legitimate penological interests in seeing that disciplinary determinations are made quickly, both for security and rehabilitative reasons. "Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances” (Superintendent of Mass. Correctional Inst. v Hill, 472 US—, 105 S Ct 2768). The primary business of prisons is the supervision of inmates, and we should not lightly impose additional administrative burdens that would detract from the ability to perform that principal mission (see, Ponte v Real, 471 US—, 105 S Ct 2192).
As for the final factor in the balance — the value of the proposed procedure — it is apparent that in the cases before us the additional step would not have significantly increased the likelihood of accurate decision-making. No claim is made that hearing officers refused to consider any evidence respondents offered, or refused to call any witness they requested. In two of the six cases, portions of the charges asserted in the misbehavior reports were dismissed. Given the nature of the charges and responses there is little reason to believe that private interviews of the correction officers would have resulted in the dismissal of additional charges.[3] Evaluating all the factors, we conclude that the hearing officers were not required by the Constitution to interview the charging officers. The requirements of due process are satisfied in this context when there is "some evidence” — "any evidence in the record that could support the conclusion reached by the disciplinary board” (Superintendent of Mass. Correctional Inst. v Hill, 472 US—, 105 S Ct 2768, 2774, supra). This standard, less stringent than a "substantial evidence” standard, was plainly satisfied in the cases before us (see, Superintendent of Mass. Correctional Inst. v Hill, 472 US—, 105 S Ct, at p 2776, n 3 [Stevens, J., concurring in part and dissenting in part], supra).
Accordingly, the orders in People ex rel. Vega v Smith and Peo *143 ple ex rel. Corcoran v Smith[4] should each be modified, without costs, by dismissing the converted proceeding and, as so modified, affirmed. The orders in Matter of Porter v Smith, Matter of Semper v Smith, Matter of Primo v Smith and Matter of Nesmith v Smith should each be reversed, without costs, and the petitions dismissed.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons, Alexander and Titone concur.
In Matter of Semper v Smith, Matter of Primo v Smith, Matter of Nesmith v Smith and Matter of Porter v Smith: Orders reversed, without costs, and petitions dismissed.
In People ex rel. Vega v Smith and People ex rel. Corcoran v Smith: Orders modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

. For certain hearings, the regulations provide that where inmates are illiterate, non-English speaking or closely confined, or the issues are complex, the inmate may select an employee from a list as an assistant (7 NYCRR 251-4.1, 253.4, 254.4). The assistant’s role is to explain the charges, interview witnesses, obtain documentary evidence or written statements, and report back to the inmate (7 NYCRR 251-4.2).

. While respondents contend that the new regulations eliminate the former requirement that an employee with actual knowledge of the incident be called to the hearing, in fact the superseded regulations required only that the presiding officer interview employees who witnessed or had direct knowledge of the incident (see, former 7 NYCRR 253.4 [c] [repealed eff June 15,1983]). There was no requirement that such an interview take place at a hearing.

. It is clear that the hearing officer has no duty to challenge or cross-exam-inc anyone, including the charging officer. In the District of Columbia, where inmates are represented at WoZyf hearings by law student interns, the hearing officer initially reads and may rely on the disciplinary report. The inmate in his defense may then call the writer of the report to testify. "Most, clients are advised, however, not to exercise their right because the writer, more often than not, will only repeat the description of the incident given in his report, from which he is allowed to read at the hearing” (Babcock, Due Process in Prison Disciplinary Proceedings, 22 BCL Rev 1009, 1050).

. We do not reach respondent Corcoran’s argument that it was error to convert his habeas corpus petition to an article 78 proceeding, since that argument could not in any event result in an affirmance of the Appellate Division order (CPLR 5501 [a] [1]).