*322 OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The petitioner’s 23-hour lock-in status at the Rikers Island Detention Facility is invalid under respondent Department of Correction (hereinafter DOC) rules and regulations and under New York law. Relief under CPLR 7804 is granted* and the petitioner is ordered restored to custody in general population.
A. Introduction
On November 17, 2004, this court was designated to the Supreme Court, Bronx County, Rikers Island Detention Facility Court, where it heard petitioner’s application dated October 28, 2004. In the petition the petitioner asserted that on October 3, 2004 an incident occurred at the jail that resulted in the filing against him of two infractions: assaulting an inmate resulting in injury and refusal to obey a direct order to stop fighting. From October 4, 2004 he has been held in a form of custody (DOC has called it by various names including prehearing detention status, administrative detention, detention based on a Board of Correction variance, special lock-down status) that required that he be locked in his cell 23 hours a day (23-hour lock-in). Until December 17, 2004, the 23-hour lock-in continued even though the petitioner was not provided with a hearing of any kind. On December 17, 2004, a special “restrictive housing hearing” was held pursuant to DOC Directive 6005 (hereinafter 6005). Petitioner continues to be held in 23-hour lock-in, which he alleges has actually been a 24-hour lock-in. The issue for purposes of this proceeding is the legality of the 23-hour lock-in for which no termination date has been set.
B. Events before November 18, 2004
At the proceeding before the court on November 17, 2004 at Rikers Island, DOC supplied the court with several documents. These documents as well as information gleaned from the subsequent days of hearing, and the oral arguments and written submissions of counsel show the following chronology.
On October 3, 2004, an inmate died at Rikers Island. It was asserted that the death was a homicide. On October 3, 2004, the petitioner was in custody in general population where he had been since his June 4, 2004 arrest on a drug case arising out of New York County. After the incident that resulted in the homi *323 cide, the petitioner was given medical treatment and returned to general population. He was not placed in 23-hour lock-in until the next day.
DOC stated that on October 3, 2004, petitioner was given oral notice of an infraction hearing which did not contain notice of the specific infraction. Rather, he was told that he was going to be placed in 23-hour lock-in status as a result of a homicide.
On October 4, 2004, petitioner was placed in the Central Punitive Segregation Unit. DOC requested from the Board of Correction a “limited variance” from the rule limiting daytime lock-in to two hours a day in order to keep petitioner in 23-hour lock-in. The variance was granted on the condition that petitioner get his infraction hearing.
On October 6, 2004, the petitioner received notice of the two infractions set out above.
At some point close to October 6, 2004, hearings at the prison were begun on the infractions for some of the inmates allegedly involved in the homicide, but not for the petitioner. However, the hearings as well as all investigations by DOC were stopped at the request of the Bronx County District Attorney’s Office and all records were sealed. The District Attorney’s Office did not want to create Rosario or discovery material that would become available to the defense in the anticipated criminal cases or have other inmates testifying as witnesses for the inmates who had been given infractions.
On November 3, 2004, four weeks after the 23-hour lock-in began with no hearing given, an indictment was voted charging the petitioner and six other people with manslaughter, assault and gang assault. The transcript of the grand jury presentation was not prepared and was not available for the proceedings on this petition or for DOC. DOC and its officials in this case did not know what role, if any, the petitioner played in the alleged homicide.
Next, chronologically, the petitioner filed this petition. On November 10, 2004, 13 days after he signed the petition, the petitioner was given a “notice of prehearing detention” by DOC. The notice contemplated an infraction hearing and a possible specific term of segregation time. The notice read:
“Pending investigation by the investigation division you are being placed in pre-detention housing pending a disciplinary due process hearing, based on the Department of Correction’s belief that you have *324 committed an infraction. If at the conclusion of the inmate disciplinary due process hearing you are found guilty of violating one or more of the Departmental rules outlined in the inmate rule book and the penalty imposed is or includes a definite period of punitive segregation time, all time spent in PreDetention housing will count toward the punitive segregation time imposed.”
DOC acknowledged that this was not a valid notice of infraction.
C. Proceedings of November 18 and 22, 2004 and December 14, 2004
In the proceedings before the court in November and December 2004, the prosecutor and DOC provided their reasons for why the petitioner should not be given a hearing to determine the validity of the 23-hour lock-in.
DOC argued that a homicide had taken place at the facility and that steps had to be taken to protect the security of the individuals involved in the homicide as well as the institution. At the November 18, 2004 proceeding, DOC agreed that the information relevant to whether there was a violation of the rules of the institution would be the same information that was relevant to the criminal prosecution and was concerned that at an infraction hearing the petitioner would be allowed to call at least some of the witnesses who would be called at the criminal trial which would create discovery material.
On December 14, 2004, DOC’s position was that any delay in the infraction hearing was no problem, and that, if the petitioner was prejudiced by the delay, he could show that whenever he was given his hearing. The new position of DOC was that the infraction was not the basis of the 23-hour lock-in; rather, security issues were and that no infraction hearing was needed. On the other hand, DOC said that to avoid release of the petitioner into general population it would agree to hold a hearing. (Transcript at 107.) Finally, DOC took the position that a lesser form of custody, such as administrative segregation of high security inmates, would not be used here because such confinement involved communal activities inviting security breaches.
The Bronx District Attorney’s Office’s (hereinafter the prosecutor) argument was that the very voting of the indictment against the petitioner gave cause to believe that the petitioner was involved in the crime and that the indictment *325 “would be a clear bright line that would demonstrate he is in a different circumstance from the average inmate on the island.” The indictment, argued the prosecutor, was evidence that petitioner was a threat to the safety of others. (Transcript at 21.)
The argument by the prosecutor was that no hearing should be held because this was a case that took place in the prison raising security concerns and that:
“[T]he majority of witnesses to this incident are incarcerated and remain subject to threats by either defendant or to other members of other people who have been indicted in the case. So our concern is this could be also a mechanism towards intimidating witnesses or attempting to dissuade them from assisting in the investigation or the prosecution of this matter.”
The prosecutor continued arguing that the right to call witnesses at an infraction hearing raised two issues: petitioner’s attempts to compel his codefendants to testify and efforts to get unauthorized depositions. The prosecutor argued that DOC should just put the petitioner and the other people indicted for the homicide in general population and keep them separate from each other.
D. The DOC Hearing
1. The Decision to Hold the Hearing
On December 14, 2004, DOC stated that it would not provide a hearing to the petitioner based on the infraction. However, it stated that it would provide a hearing pursuant to 6005, the “Restrictive Housing Due Process” directive, on the question of whether the 23-hour lock-in was needed for the petitioner’s safety, the safety of the other inmates and the continued good working of the institution.
2. The Hearing
After the December 15, 2004 proceedings before this court, DOC scheduled a hearing concerning petitioner’s lock-in status. A notice of the hearing, dated December 15, 2004, was given to petitioner. The notice read in pertinent part:
“This is to inform you that you are being placed in the following restrictive housing status: . . . Protective Custody 23 hour lock-in as per Board of Correction variance . . .
“Reasons for placement and the evidence relied upon to make this decision: Because you were *326 indicted for Manslaughter in the Second Degree in the homicide of Tyree Abney at the George Motchan Detention Center on October 3, 2004, and because of the known gang affiliation of alleged participants in that homicide, the Department of Correction has determined that, in order to protect your safety and the safety and security of other inmates, staff and others in the facility you must be housed in 23-hour lockdown status, with individual recreation.”
The notice advised petitioner that, if he disagreed with the placement, he was entitled to a hearing before an impartial hearing officer from the adjudication unit within 24 to 48 hours after he received the notice. The notice said that at the hearing petitioner had the opportunity to personally appear, the right to be informed of the evidence resulting in the placement, the right to review documentary evidence relied upon by the Department, the opportunity to make a statement, and the right to call both inmate and staff witnesses and present documentary evidence subject to the hearing officer’s discretion to keep the hearing within reasonable limits. At the hearing the petitioner was represented by Mr. Lugo and also present were the hearing officer who was a captain in the Legal Division of DOC, and DOC counsel.
a. The Documents Listed by the Hearing Officer
The hearing officer began the hearing by stating that DOC provided him with an “ample amount of information” about why the petitioner posed a threat to others or himself and why he should be in protective housing. The information was in the indictment filed against petitioner and others, and several documents and memoranda dated December 14, 15 and 16, 2004. Petitioner’s counsel was given the documents prior to the start of the hearing. No witnesses were called by DOC and DOC counsel provided no information at the hearing. One document described gang activity in prison and how violent conduct is prized behavior. The memorandum states that “many of these gangs will not allow potential members to join until they have proven themselves through an initiation rite of committing a violent act, often a killing.” It states that 1,200 dangerous groups were being monitored. The memorandum referred generally to inmates who were in gangs and injured others and tampered with witnesses.
Another memorandum written listed five people who had been detained in 24-hour lock-in based on evidence before judges who *327 issued lock-in orders in the period between 1999 and 2002. None of the five people were involved in the incident that was alleged to have occurred at Rikers on October 3, 2004, and nothing shows a connection or relationship to the petitioner.
Another memorandum asserted that the intelligence unit had “credible information” that four of the seven people indicted for the October 3 incident were affiliated with gangs, some in positions of authority. The memorandum concludes:
“Although [petitioner is] not now known to us to be a member of a gang, we cannot rule out the possibility that the assault that resulted in the homicide was related to an initiation into some gang if he is not already a member of one.
“Although [petitioner] may not be aware of any danger to himself, it is always possible in a case with so many co-defendants and witnesses to the incident that someone may wish him harm and could make good on that wish.”
Another memorandum introduced press releases about cases in federal court in 2003 and early 2004. The cases had nothing to do with the events on October 3, 2004 at Rikers Island or the petitioner.
Additional memorandum concluded that the petitioner was placed in 23-hour lock-in status because he “was indicted for and is believed to have engaged in a violent act that resulted in the death of another inmate”; “5 of the 6 inmates involved in this incident are affiliated with a security risk group [which] increases the likelihood” that other inmates might want to harm him or that he would tamper with witnesses for the prosecution; any level of commingling with other inmates could result in harm to inmates or staff; and if anyone tried to harm petitioner, correction officers “would be in harm’s way” if the petitioner was not in 23-hour lock-in. The memorandum supplied no information about the alleged incident or petitioner’s role and did not reveal the information in the correction records of the petitioner, the other inmates, or the incident.
Another memorandum stated that the petitioner’s “legal status in the homicide is unknown to the Intelligence Unit. IU surmises that [petitioner] is charged in the matter but his role in the investigation is uncertain.” The memorandum referred to other incidents in the jail involving witness tampering and threats having nothing to do with this case or the petitioner.
A letter related to a codefendant’s prior conduct, gang membership, acquittals of prior homicide charges, infraction re *328 cords, and conviction for an assault on another inmate in 1993. This letter does not relate to petitioner. According to the hearing officer, DOC was using this information “as a basis of also showing that this [is] another reason why Mr. Santiago needs to be protected maybe not from himself maybe from [the codefendant], we don’t know. This is why the Department has given me this.”
b. The Limits on the Petitioner’s Participation in the Hearing
After listing what written material DOC had presented, the hearing examiner told petitioner that he could present witnesses to tell him why he should not be in the status, “not anybody that will tell me about your criminal case, but somebody that would tell me why you should not be in this status.” When petitioner explained that his witnesses were primarily upstate because they were sentenced, the officer said that was “not what we’re here for.”
Further, despite DOC’s use of information that occurred as early as 1999, the hearing examiner refused to permit the petitioner to supply any information about anything that happened prior to December 15, 2004, the date the petitioner was given notice of the hearing to be held on December 17, 2004. In response, the petitioner said that he had no witnesses. He said the only witness he had was his lawyer.
The hearing officer said, “[Y]ou heard the department stance on why we feel you should be in restrictive housing,” and then said, “[E]xplain to me why you feel you should not be in this restrictive housing status.”
Petitioner stated over and over again that he had not been threatened, he did not feel threatened and he had no information that anyone was out to do him harm and therefore 23-hour lock-in was not warranted. He heard nothing from the street and from the other inmates at the jail, many of whom were gang members and whose voices he could hear in the unit.
The hearing officer admitted that he was not aware from the information given to him by DOC of any threats directed against the petitioner, whether by codefendants or other inmates. He acknowledged that there was only the possibility that someone in a gang might take action against the petitioner.
After conceding that there was no evidence of a threat to petitioner, the hearing officer moved on:
“[T]he department [sic] stance is also to protect our correctional staff and to also protect other inmates. *329 So understand that it’s actually threefold what the department is providing you for their determinations. Not only to protect you but to protect correctional staff who can, would be attacked possibly if they’re escorting you and somebody attacks you which is one of the things that the department was also concerned then that I read as well as other inmates safety also . . . .”
c. Decision by the Hearing Officer
At the conclusion of the hearing, the hearing officer filed a decision. The first page was a form cover sheet in which he found that the hearing was a protective custody hearing for “23 hour lock-in as per Board of Correction variance,” and that he was ruling on the “placement” of the petitioner “into special housing/status” (rather than the “continuation” of the petitioner in special status in which petitioner had been since October 4, 2004). The hearing officer concluded that the petitioner should be “continued” in 23-hour lock-in.
In the written opinion filed with the cover sheet the hearing officer stated that DOC had “provided him with strong evidence to support their decision to implement this restrictive housing designation.” He listed the names of the people who supplied memoranda connected with DOC’s position. The hearing officer referred to lock-in orders in other cases involving gang members to show that they threaten and intimidate others “as evidence to [sic] the type of groups that inmate Santiago’s co-defendant’s belong to.”
In the written opinion, the hearing officer acknowledged that none of the documents shows a “direct threat” to petitioner. He also stated that the petitioner had an opportunity to provide him with “any tangible argument concerning this placement.” The hearing officer accepted DOC’s contention that 23-hour lock-in was the least restrictive means to protect the petitioner and to protect others from the petitioner. Except for the references to the conclusions made by DOC officials who wrote the memoranda, the hearing examiner made no reference to any information in any document, and made no reference to information that related to the petitioner.
E. Posthearing Proceedings and Submissions
On December 20, 2004, the parties returned to this court to argue about whether the order for the lock-in was valid. When asked to explain the connection between the information about other people and other incidents to the petitioner, DOC stated:
*330 “Petitioner is indicted for the homicide of Tyree Abney. Petitioner is alleged to have participated in the assault of Tyree Abney which led to his death. The facts are that four other people who are alleged to have aided him in that assault are known gang members and they have a history of assaults on other people, other gang members and various gangs and also a history of violence. Those factors are facts involving Mr. Santiago.”
DOC explained, “[T]he evidence that was adduced at the hearing stated that the threat posed by [petitioner] would be an untenable threat to the Department . . . The threats would be that either he would be injured by other inmates or he would injure other inmates.” When asked to set out the evidence of the threats, DOC said:
“I would state that the evidence is the crime that he’s charged with and the circumstances surrounding that crime. Those are the facts and those are the evidence that was considered . . . He doesn’t [have gang affiliation], but four other members, four other individuals who are charged with the homicide do, and that is a fact that we can take cognizance of. . . That four out of seven people who were involved in this homicide were gang members . . . is something the Department of Correction can take consideration of. That is a fact it is a fact that leads us to believe that certain things are more than possible, they’re extremely likely . . . We don’t have to wait for something to happen ... for us to take a reasonable measure in response.” (Transcript at 159-160.)
DOC said, “The reasons [for the 23-hour lock-in] are the facts surrounding the homicide and [petitioner’s] alleged involvement in that crime. The fact that the person was killed by [petitioner] and four other people who are known gang members including people who are very high up . . . .”
DOC insisted that there had been
“an individualized assessment regarding the factors surrounding his confinement and the assessment was that if [petitioner] were placed in any less restrictive housing he would be a danger to others, others would be a danger to him and the staff and the facility security would be compromised . . . because of the facts surrounding the charges in the *331 indictment and the gang association of other members who are charged with him.”
Despite these repeated assertions, DOC acknowledged that they did not know what the petitioner did in the incident because they did not know the exact circumstances surrounding the crime. The transcript of the grand jury proceedings was not yet prepared by the prosecutor’s stenographer and was not available, and DOC conceded that the hearing officer did not see the grand jury transcript or the investigation reports and relied only on the indictment to make his decision and to decide the circumstances of the crime.
Faced with the understanding that no one at DOC, including the hearing officer, knew anything about the petitioner’s conduct on October 3, 2004, DOC backed off its position, articulated often in the colloquy, that it was relying on the circumstances of the crime. The new argument was that the mere fact that there was a homicide at the prison and that some of the codefendants were fairly high ranking gang members was enough to put the petitioner in 23-hour lock-in.
In the colloquy, DOC acknowledged that the petitioner was not a gang member, that he was not threatened and that the circumstances of the October 3 incident were unclear. When asked why Santiago would be put into 23-hour lock-in because other people might be threatening to him, DOC answered: “Not every person who is a gang member can be placed in an administrative situation where they can’t come into contact with the inmates.”
DOC also admitted that not every inmate charged in an indictment with serious assault or homicide against another inmate is placed in 23-hour lock-in, but argued that petitioner is in 23-hour lock-in “just based upon his status, upon his history and the crime that he is charged with.”
DOC disclosed that one of the codefendants has never been in 23-hour lock-in and had been in high security custody without lock-in. There was no evidence that that person caused any security problems or was endangered in the period between October 3, 2004 and December 21, 2004.
The prosecutor had no idea when the case against the petitioner would go to trial and stated that because of the number of defendants and the pretrial proceedings, including hearings, the trial could be in the spring or later.
*332 Findings and Conclusions
For the reasons set out, this court finds that the petitioner’s detention in 23-hour lock-in is invalid. Because DOC has stated repeatedly that there is no lesser form of custody than 23-hour lock-in in which to house the petitioner, DOC is required to release the petitioner from 23-hour lock-in to general population.
The December 15, 2004 notice of hearing, the implications of the hearing officer’s opinion, and the statements of DOC before the court on December 20, 2004 show that the basis of the finding that the petitioner was in danger and was a danger to others was the indictment of the petitioner for acting in concert to commit manslaughter and assault, and the gang membership of four of the seven defendants charged in that indictment. According to DOC, these two circumstances justify locking the petitioner in his cell for 23 hours a day.
The record of this case shows that there was no evidence before the hearing officer, and therefore no “substantial evidence” before him, that the petitioner committed a crime in the prison. The record also shows there is no reasonable inference, and therefore no evidence, that petitioner posed a danger or faced any danger because some of his codefendants were gang members. Further, the hearing officer deprived petitioner, without reason or notice, of the right to present evidence at the hearing. In addition, by succumbing to the improper pressure from the prosecutor’s office not to reveal any information about the October 3 incident and the witnesses to it, DOC deprived the petitioner of proper notice of the accusations and an opinion that satisfies the DOC regulations and the relevant statutes. Finally, assuming that the Board of Correction’s variance is the controlling document for the 23-hour lock-in, DOC has violated the condition upon which the Board of Correction granted the lock-in, rendering it invalid.
A. Reliance on the Indictment for Manslaughter was a Violation of Department of Correction Rules and the Relevant Statutes
1. Hearing Officer Failed to Make an Independent Decision Based on the Evidence Presented to Him as Required by Directive 6005
6005 sets out the procedures and rules to be followed at a restrictive housing hearing and DOC is obliged to follow those rules (see Matter of Frick v Bahou, 56 NY2d 777 [1982]), but did not do so here. Further, New York statutes set requirements for *333 administrative proceedings that are reviewable by the courts under article 78 and they apply to the proceedings conducted here.
Under 6005, written notice to an inmate must describe the evidence relied upon to place the inmate in restrictive custody. (6005 [V] [B] [1] [b].) To assist the hearing officer in the making of a decision “based on the evidence adduced at the hearing,” the hearing officer must keep notes of the hearing and those notes must be maintained. (6005 [V] [B] [5].) When the hearing is over, the hearing officer must decide whether the evidence supports a decision to place the inmate in restrictive housing. (6005 [V] [B] [12].) The decision and the reason for the decision “must be based solely on evidence presented at the hearing.” {Ibid.)
Usually a “charging document” does not provide the evidence. (Matter of Bryant v Coughlin, 77 NY2d 642, 648 [1991].) Here, the quintessential charging document, the indictment, along with the gang membership of some of the codefendants, was the information on which the hearing officer relied. But the indictment reflected only the conclusion of the grand jury, based on evidence that it saw or heard. There was no evidence before the hearing officer about the basis for the grand jurors’ conclusion. The grand jury was the accuser which relied upon what the witnesses before it had said.
This opinion of the grand jury, which was manifested by the indictment, did not enable the hearing officer to make an independent determination of the petitioner’s conduct and whether it showed him to be in danger or dangerous, the justification for the 23-hour lock-in. The requirement of 6005 is that the hearing officer himself hear or read the evidence of conduct or circumstances showing dangerousness. Whether the evidence was the testimony before the grand jury or other appropriate evidence, the hearing examiner was required to make an independent judgment based on the evidence. In Matter of Abdur-Raheem v Mann (85 NY2d 113 [1995]), the Court of Appeals analogized the due process function of the hearing officer to make an independent judgment with that of the magistrate issuing a warrant {id. at 120), and said:
“[A] Hearing Officer in a prison disciplinary proceeding may not rely on information provided by confidential informants unless the Hearing Officer first makes an independent assessment of the informant’s reliability. While this Court has not *334 expressly held as much, the lower courts of this State have long assumed that the Hearing Officer cannot simply rely on the investigating authority’s determination but must instead make his or her own evaluation of the informant’s credibility . . . [W]here the law requires the interposition of a neutral arbiter, the obligation to weigh and resolve the material fact questions lies squarely with the arbiter and may not be delegated to the investigator or the accuser.” {Id. at 119-120.)
Appellate Division decisions since Abdur-Raheem have elaborated on the rule and applied the rule to prison security hearings. For example, in Matter of Roe v Selsky (250 AD2d 935 [3d Dept 1998]), an inmate was placed in a special housing unit of a correctional facility and given notice that he “pose[d] a threat to [the] safety, security and good running order” of the facility. (Id. at 935.) At a prison hearing where the inmate challenged his placement in the special housing unit, the hearing officer reviewed confidential information in camera which the reviewing court found provided “detailed and specific information sufficient to form an objective basis for the Hearing Officer’s determination that reliable and credible information existed to support the administrative segregation recommendation.” (Id. at 936-937.) Here, no information of any kind about the details and circumstances of the October 3 incident was made available for examination by the hearing officer.
Other decisions in the prison disciplinary context further explain the requirement of an independent assessment of the evidence by the hearing officer. In Matter of Debose v Selsky (12 AD3d 1003 [3d Dept 2004]), the Court concluded that confidential information given by a correction officer who conducted an investigation and wrote a misbehavior report and then gave testimony at an in camera hearing provided insufficient information to the hearing officer at that proceeding:
“to enable the Hearing Officer to independently assess the credibility and reliability of the confidential informants, who did not testify. It is well settled that a disciplinary determination may be based upon hearsay confidential information, provided that it is sufficiently detailed for the Hearing Officer to make an independent assessment of the informant’s reliability.” (Id. at 1004.)
In Matter of Irving v Goord (288 AD2d 787 [3d Dept 2001]), the Court concluded that there was nothing in the record to *335 indicate that the hearing officer made an independent assessment of the credibility and reliability of the confidential information and that the information itself shows that it was so lacking in detail that an assessment could not be made. The hearing officer impermissibly relied on the correction officer’s appraisal and the determination was annulled.
In Matter of Callens v Goord (286 AD2d 811 [3d Dept 2001]), the Court wrote: “It is well settled that a disciplinary determination may be predicated upon hearsay confidential information provided it is sufficiently detailed for the Hearing Officer to make an independent assessment of the informant’s reliability.” (Id. at 811-812.) The Court went on to find that the information was not sufficiently detailed to enable a hearing officer to make an independent assessment of credibility. (Id. at 812; see also Matter of Peters v Goord, 280 AD2d 738 [3d Dept 2001]; Matter of Daise v Giambruno, 279 AD2d 911 [3d Dept 2001]; Matter of Vega v Goord, 274 AD2d 807 [3d Dept 2000]; Matter of Holmes v Senkowski, 238 AD2d 629, 629-630 [3d Dept 1997]; Matter of Huggins v Coughlin, 184 AD2d 823 [3d Dept 1992].)
Where the hearing officer interviews the confidential informer who supplies the needed information (even if the interview is in camera to protect the identity of the informer) or examines reports and documents that are sufficiently detailed to make credibility and reliability judgments, the hearing officer is able to make his own appraisal of the confidential informer’s reliability as is required. (Matter of Berry v Goord, 13 AD3d 947 [3d Dept 2004]; Matter of Thomassini v Goord, 13 AD3d 954 [3d Dept 2004]; Matter of Ferguson v Goord, 13 AD3d 949 [3d Dept 2004]; Matter of Berry v Portuondo, 6 AD3d 848 [3d Dept 2004]; Matter of Ward v Murphy, 302 AD2d 839, 840 [3d Dept 2003]; Matter of Cobb v Selsky, 270 AD2d 747 [3d Dept 2000]; Matter of Milland v Goord, 264 AD2d 846 [2d Dept 1999]; Matter of Agosto v Goord, 264 AD2d 840 [2d Dept 1999]; Matter of Cotto v Bautista, 252 AD2d 977 [4th Dept 1998]; Matter of Martinez v Goord, 248 AD2d 1001 [4th Dept 1998]; Matter of Hazel v Coombe, 239 AD2d 736, 737 [3d Dept 1997]; Matter of Huggins v Coughlin, 184 AD2d 823 [3d Dept 1992].)
In this case it is clear that the hearing officer did not hear or read about the evidence because the evidence against the petitioner was not included in the notice that was provided to him on December 15, 2004; the grand jury minutes were never given to the hearing officer; the documents that were provided to the hearing officer did not contain any reference to the evi *336 dence; the DOC’s internal investigation was stopped by the prosecutor and the records were sealed and made unavailable to the hearing officer; other DOC disciplinary hearings were terminated before their completion at the prosecutor’s request; and the hearing officer did not make any reference to the evidence in his opinion.
The hearing officer’s failure to make an independent assessment of the evidence of the October 3, 2004 incident requires nullification of the lock-in and the petitioner’s release to general population.
2. The Hearing Officer’s Decision was Not Supported by “Substantial Evidence”
The requirement of CPLR 7803 (4) that a decision of an agency be supported by “substantial evidence” applies to all proceedings reviewable under article 78 including prison and jail proceedings that concern both security and discipline. (Matter of Blake v Mann, 75 NY2d 742, 743 [1989]; People ex rel. Vega v Smith, 66 NY2d 130, 139 [1985]; Matter of Potts v New York City Dept. of Correction, 280 AD2d 329 [1st Dept 2001]; Matter of Robinson v Leonardo, 179 AD2d 951, 952-953 [3d Dept 1992], lv denied 79 NY2d 759 [1992]; Matter of Kalonji v Coughlin, 157 AD2d 941, 942 [3d Dept 1990]; see also Matter of Abdur-Raheem v Mann, 85 NY2d 113 [1995]; Matter of Bryant v Coughlin, 77 NY2d 642 [1991].) Many judicial decisions discuss whether “substantial evidence” supports the finding that is being reviewed under CPLR 7803 (4). These precedents show that the record in this case does not provide “substantial evidence” to justify the conclusion that the petitioner is a danger to himself or others because the record is barren of any evidence at all to support that conclusion.
“Substantial evidence” need not be firsthand testimony or information. It can be hearsay if it is sufficiently probative and relevant, and is described with specificity. (People ex rel. Vega v Smith, 66 NY2d at 139-140.) In Vega, the information in the six reports examined by the Court gave details of the incidents including the specific conduct of the six inmates charged and were found to be specific enough to meet the “substantial evidence” test. (Id. at 133-137; see also Matter of Vogelsang v Coombe, 66 NY2d 835 [1985], affg 105 AD2d 913 [3d Dept 1984] [correction officer specifically explained what the inmate had done to him during a prison riot].)
The cases define and describe substantial evidence in both disciplinary and security contexts. For example, in Matter of *337 Bryant v Coughlin (77 NY2d 642, 649 [1991]), the Court, citing People ex rel. Vega, wrote: “A prison disciplinary determination must be supported by substantial evidence, meaning that in order to sustain a determination of guilt, a court must find that the disciplinary authorities have offered such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact.” (Id. at 647.) The Court further stated that without some specificity as to the conduct attributed to the petitioners, reports relating only information about the incident generally did not constitute substantial evidence of guilt (id. at 644), and what is needed is “particularized individual descriptions of misconduct.” (Id. at 649; see Matter of Berry v Portuondo, 6 AD3d 848 [3d Dept 2004]; Matter of Hazel v Coombe, 239 AD2d 736, 737-738 [3d Dept 1997]; Matter of Vargas v Coughlin, 123 AD2d 486 [3d Dept 1986]; Matter of Rogers v Coughlin, 120 AD2d 844 [3d Dept 1986].)
In cases in which the evidence, whether written or oral, hearsay or not, given ex parte or not, fails to set out the particular conduct of the inmate who is subject to discipline, the charges are found not proven by substantial evidence. (Matter of Debose v Selsky, 12 AD3d 1003 [3d Dept 2004] [court found that there was detailed information about the scheme to bring contraband into the prison, but because there was no information that tied the inmate to the scheme presented to the hearing officer by the informer or the correction officer, the finding of the hearing officer was annulled]; Matter of Irving v Goord, 288 AD2d 787 [3d Dept 2001]; Matter of Callens v Goord, 286 AD2d 811 [3d Dept 2001]; Matter of Daise v Giambruno, 279 AD2d 911 [3d Dept 2001]; Matter of Martinez v Goord, 248 AD2d 1001 [4th Dept 1998]; Matter of Carter v Kelly, 159 AD2d 1006 [4th Dept 1990].)
The requirement of specificity applies in prison security cases as well. In Matter of Roe v Selsky (250 AD2d at 936), the Court noted that there was specific and detailed information relating to the inmate’s own activities as a member of a gang that justified the inmate’s placement in administrative segregation. The opinion makes clear that other information undisclosed in the opinion of the Court was also before the hearing officer. (Id.)
In Matter of Kalonji v Coughlin (157 AD2d at 942-943), the Court found that the decision to place the petitioner in involuntary protective custody was “unsupported by substantial evidence” when the hearing officer considered only the hearsay statements of the informants without any objective basis for *338 crediting those statements and without interviewing the witnesses to cure the defect. (See also Matter of Robinson v Leonardo, 179 AD2d at 953.)
In this case, there was no evidence that explained the October 3, 2004 incident and none to explain the petitioner’s involvement. Consequently, there was no evidence to support a finding that the incident of October 3, 2004 showed that the petitioner was a danger to others or that he was in danger. DOC itself agreed by stating before this court that “in order for us to present information about the security issues, we would have to demonstrate his involvement in the homicide because if he wasn’t actually involved in the homicide, why would we be concerned?”
The opinion of the grand jury based on information undisclosed to the hearing officer did not provide any evidence and therefore the “substantial evidence” test was not met.
B. Gang Membership
[Discussion about the lack of evidence to support a finding of gang membership or association with gang members is redacted.]
C. The Petitioner was Denied His Right to Defend Against the Charges
Under 6005, the petitioner must be given the opportunity to make a statement and the right to call inmate and staff members subject to keeping the hearing within reasonable limits. (6005 [V] [B] [3] [c], [e], [g].) Despite this clear statement of the controlling rule, the hearing officer precluded evidence by the petitioner about the incident of October 3, 2004 and evidence that related to any time before December 15, 2004.
At the beginning of the hearing, the hearing officer told the petitioner that no information about the incident of October 3, 2004, including testimony by witnesses, could be presented in defense. The hearing officer also said that the petitioner was limited to presenting information about circumstances after December 15, 2004, the date on which he was given notice of the restrictive housing hearing which was held on December 17, 2004.
When petitioner pointed out that the limited variance issued by the Board of Correction was violated because the variance limited the 23-hour lock-in to the time it took to give the infraction hearing, the hearing officer said, among other things, that he would not consider the variance because he would not *339 consider any matters that took place before December 15, 2004. When petitioner said that his witnesses were sentenced and upstate, the hearing officer said that was not of concern because they could not testify. The time limit also prevented any testimony about the relationship of the petitioner and the codefendants, one of whom was not even in lock-in status. Obviously, any information about the relationship or the absence of any relationship between the petitioner and the codefendants would have been about the period before December 15, 2004.
Although limits were imposed on the petitioner during the hearing, the hearing officer took the opposite position with respect to DOC and permitted DOC to introduce into evidence memoranda and documents that were based on information and events that preceded December 15, 2004. For example, one memorandum provided detailed exposition of six inmates against whom lock-down orders were obtained due to their gang-related activity. The lock-down orders with respect to these six inmates were issued between 1998 and 2002, which was well outside of the two-day window set by the hearing officer. The Department also introduced a memorandum to which was attached press releases detailing criminal acts committed by various members of the “Bloods” gang. These press releases concerned activities that took place by individuals wholly unconnected to the petitioner between 1996 and January 2004.
DOC was then permitted to introduce a letter from an assistant district attorney which outlined bad acts and gang-related activity committed by one of the petitioner’s codefendant’s in the criminal case that allegedly took place between 1993 and October 3, 2004. DOC was also permitted to introduce into evidence the indictment even though it was voted by the grand jury on November 3, 2004 and was asserted to be concerned with conduct that allegedly took place on October 3, 2004.
The denial of the right to present evidence is especially troublesome in hearings held in prisons and jails. The inmate’s right to see his accusers and to cross-examine is severely limited. (See People ex rel. Vega v Smith, 66 NY2d at 141.) To compensate for these limits, the rules not only require an independent assessment of the evidence by the hearing officer, but the right of the petitioner to present his own information and have access to witnesses. He was denied both in this case and the decision to find him dangerous or in danger was invalid.
D. The Contents of the Notice of Hearing and the Contents of the Opinion
*340 Under 6005 both the notice of hearing and the opinion issued at the close of the hearing must include the evidence against the petitioner. Here, because no one involved in the 6005 proceedings knew or was willing to disclose the information, in deference to the prosecutor, there was no evidence included in either the notice or the opinion. Accordingly, both are invalid.
The order placing the petitioner in 23-hour lock-in is invalid and the Warden of Rikers Island and/or his agents shall release the petitioner from 23-hour lock-in custody and return the petitioner to general population.
[Portions of opinion omitted for purposes of publication.]

 The petitioner filed a CPLR article 78 proceeding that was converted to a writ of habeas corpus. This court reverts the application to an article 78 proceeding.