Matter of McPherson v Hill

2026 NY Slip Op 03216

May 21, 2026

Appellate Division, Third Department

Garry, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

In the Matter of Oswald McPherson, Petitioner,

v

Superintendent Hill, as Superintendent of Wyoming Correctional Facility, et al., Respondents.

Decided and Entered:May 21, 2026

CV-25-1805

Calendar Date: April 17, 2026

Before: Garry, P.J., Aarons, Reynolds Fitzgerald, Powers And Corcoran, JJ.

Oswald McPherson, Attica, petitioner pro se.

Letitia James, Attorney General, Albany (Kate H. Nepveu of counsel), for respondent.

[*1]

Garry, P.J.

Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent Superintendent of Wyoming Correctional Facility finding petitioner guilty of violating certain prison disciplinary rules.

Petitioner, an incarcerated individual, was charged in a misbehavior report with violent conduct and creating a disturbance. The accounts of the subject incident offered by petitioner and the correction officer who authored the misbehavior report vary significantly in terms of the nature of petitioner's conduct and his intent, but both generally involve petitioner's interaction with other incarcerated individuals in a dayroom, during which petitioner either flipped or threw a chair while speaking loudly. Unable to obtain objective body-worn camera footage from the encounter, the Hearing Officer credited the version of events proffered by the correction officer in her report and at the ensuing tier II disciplinary hearing and found petitioner guilty as charged. The determination was affirmed upon administrative appeal, and this CPLR article 78 proceeding ensued.

Although analytically distinct, we view two of the issues raised by petitioner to be closely related: the denial of his request for body-worn camera footage and whether his determination of guilt is supported by substantial evidence. We begin by recognizing that a misbehavior report and the testimony of a correction officer may, in appropriate circumstances, serve as the evidentiary basis for a prison disciplinary determination (see People ex rel. Vega v Smith, 66 NY2d 130, 140 [1985]; see also Matter of Foster v Coughlin, 76 NY2d 964, 966 [1990]; Matter of Snyder v Annucci, 188 AD3d 1346, 1347 [3d Dept 2020]). However, that principle presupposes that such proof is sufficiently reliable and probative when viewed in light of the record as a whole (see People ex rel. Vega v Smith, 66 NY2d at 139; 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 181 [1978]; Matter of Alvarado v Annucci, 225 AD3d 978, 979 [3d Dept 2024]). It is well established that "[a] court reviewing the substantiality of the evidence upon which an administrative agency has acted exercises a genuine judicial function and does not confirm a determination simply because it was made by such an agency" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d at 181; see Matter of Pletcher v New York State Gaming Commn., 247 AD3d 1342, 1344 [3d Dept 2026]; Matter of Archer v Annucci, 153 AD3d 919, 920 [2d Dept 2017]). Rather, the evidence must consist of "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d at 180) — "the kind of evidence on which responsible persons are accustomed to rely in serious affairs" (People ex rel. Vega v Smith, 66 NY2d at 139 [internal quotation marks and citation omitted]).

At the [*2]outset of the hearing, petitioner requested the footage from a body-worn camera allegedly worn by the correction officer who authored the subject misbehavior report. Following an adjournment to obtain the footage, the Hearing Officer advised that "there is no body cam footage" — with no further explanation as to either the source of that determination or the reason such footage was absent. The misbehavior report was then read into evidence. Therein, the correction officer stated that a radio transmission, apparently by two National Guard members then deployed to the prison, reported a disturbance in a nearby dayroom, prompting her to respond. When she arrived at the dayroom, she observed petitioner "throw" a chair onto the floor while "yelling" at other incarcerated individuals in the room about their failure to clean dishes. The National Guard members who allegedly triggered this chain of events were unable to be compelled to testify. The correction officer offered testimony generally consistent with her report, with some equivocation as to the timeline, confirming that she observed petitioner yelling and saw him "toss[ ]," "put" or "throw" the chair on the floor, which she, without elaboration, viewed as an act of anger. No clarification was sought with respect to the absence of body-worn camera footage.

Petitioner acknowledged that the subject chair ended up on the floor because he "flipp[ed]" it but denied that it was thrown or that it was in any way moved in anger. He explained that, as an "ILC president,"FN1 he had been advised by prison administration of issues with dishes in common areas and sought to address same. While doing so, a "heated" dispute arose between others in the dayroom, and, according to petitioner, he flipped the chair to deescalate the dispute — drawing attention to himself — and then used the chair as an example of how creating a mess in a shared space was a problem. Petitioner testified that he then promptly picked up the chair and apologized to the individual that had been previously using it. Three incarcerated individuals who witnessed the incident testified on petitioner's behalf, each corroborating his account that he was speaking to the group about a housekeeping issue in "a good tone" or "respectfully" and was not acting in "anger" or "aggressively." Although one of petitioner's witnesses did not observe how the chair came to rest on the floor, the others described the chair as having been "knock[ed]" or "tipped" over rather than thrown with any significant force, and all further testified that petitioner restored it and apologized thereafter.

Consistent with prevailing precedent, we cannot conclude that the Hearing Officer failed to investigate the availability of the requested evidence or that petitioner's due process rights were implicated by same (see Matter of Smith v State of N.Y. [DOCCS], 239 AD3d 1117, 1118 [3d Dept 2025]; Matter of Barnes v Venettozzi, 207 AD3d 969, 970-971 [3d Dept 2022]; Matter of Anselmo [*3]v Annucci, 176 AD3d 1283, 1284 [3d Dept 2019]). However, as a result of the limited record developed with respect to that inquiry (see generally Matter of Anselmo v Annucci, 176 AD3d at 1286 [Garry, P.J., concurring in part and dissenting in part]), we agree with petitioner that the charges are not supported by substantial evidence. The determination before us rests upon a sharp conflict between the testimony of a single correction staff member, who was responding to but did not originate the report of a disturbance, and that of multiple incarcerated individuals present in the dayroom at all relevant times who corroborated petitioner's account of the incident. Generally, a hearing officer would be entitled to resolve that conflict as a matter of credibility. However, where, as here, the record presents competing versions of a discrete event and the determination turns on the acceptance of one account over another, the reliability of the credited testimony must be assessed in context. That context includes the absence of any objective documentation of the incident where there is every reason to believe that such proof should have existed.

At the time of the subject incident, the Department of Corrections and Community Supervision had implemented a body-worn camera policy pursuant to internal directive, reflecting an institutional recognition that recording such encounters is imperative for both safety and transparency (see NY St Dept of Corr & Community Supervision Direction No. 4943, last updated Feb. 11, 2025, available at https://doccs.ny.gov/system/

files/documents/2025/02/4943.pdf [last accessed May 18, 2026]).FN2 We need not decide the force of that directive to hold that it informs the nature of proof that may reasonably be expected in incidents of this kind. In the same vein, it must also be observed that, since the subject incident, the Legislature has codified the requirement of body-worn cameras in correctional settings (see Correction Law § 135 [eff July 8, 2025]), thus underscoring the State's recognition that objective evidence of interactions involving incarcerated individuals is not only critical but readily obtainable (see generally Matter of Caraway v Annucci, 190 AD3d 1198, 1200 [3d Dept 2021, Aarons, J., concurring]).FN3

Here, no such objective evidence was produced. Importantly, the record is entirely silent as to whether recording devices were being properly utilized and, if not, why not (compare Matter of Caraway v Annucci, 190 AD3d at 1199-1200; Matter of Lashway v Keyser, 178 AD3d 1224, 1225 [3d Dept 2019]). In the face of that evidentiary gap, we find that the credited testimony lacks sufficient indicia of reliability to satisfy the substantial evidence standard. We therefore reverse.

Aarons, Reynolds Fitzgerald, Powers and Corcoran, JJ., concur.

ADJUDGED that the determination is reversed, without costs, and petition granted.

Footnotes

Footnote 1

It appears that petitioner is referring to the Incarcerated Liaison Committee.

Footnote 2

Indeed, the Department of Corrections and Community Supervision has recognized for decades that video recording technology is essential to resolving conflicts between incarcerated individuals and correction officers (see generallyMatter of Anselmo v Annucci, 176 AD3d at 1287 [Garry, P.J., concurring in part and dissenting in part], citing Department of Corrections and Community Supervision, Prison Safety in New York: Working Together for Public Protection, § 9, Internal Monitoring Promotes Prison Safety [2006]).

Footnote 3

We take this opportunity to highlight that evidentiary consequences for noncompliance with the now obligatory body-worn cameras program have yet to be established (see Correction Law § 135; see generally Matter of Caraway v Annucci, 190 AD3d at 1202 [Garry, P.J., concurring in part and dissenting in part]).