*269 OPINION OF THE COURT
Margaret L. Clancy, J.
Petitioner, a pretrial detainee at Hikers Island Correctional Facility, filed a CPLR article 78 petition to invalidate the New York City Department of Correction’s determination to place him in 23-hour lock-in, where he has been housed for over six months. For the reasons set forth below, the court finds that the Department of Correction violated petitioner’s due process rights by failing to follow its own regulations for placing him in restrictive custody. The determination is therefore annulled and petitioner is ordered returned to general population.
Introduction
Petitioner, along with six other inmates, was implicated in and indicted for the October 3, 2004 fatal assault on another inmate. At the time of the incident, petitioner was housed in the general prison population at Hikers Island on a pending criminal mischief charge and a parole violation. On October 13, 2004, petitioner was summarily moved from general population into the Central Punitive Segregation Unit (CPSU) and confined to his cell for 23 hours a day. The controlling Department of Correction (DOC) regulations permit an involuntary placement in restrictive housing either pending a disciplinary hearing, or as a security measure to ensure the safety and security of inmates and staff. Whatever the basis for changing petitioner’s housing status, DOC’s regulations required that petitioner be given written notice, a timely due process hearing, and specified rights at the hearing.
The court finds that DOC violated petitioner’s due process rights by placing him in involuntary protective custody with a 23-hour lock-in without any prior notice and by failing to conduct a hearing for over 11 weeks. Further, DOC never fully informed petitioner of his rights at the hearing which it finally conducted on December 30, 2004. In addition, DOC imposed the 23-hour lock-in without obtaining the required variance.
Factual and Procedural History
The facts are largely undisputed.[1] On October 3, 2004, inmate Tyree Abney was killed in an attack by other inmates at a *270 Bikers Island facility. Two correction officers identified seven inmates involved in the attack, but petitioner was not one of them. Petitioner was, however, named in a DOC investigator’s report as one of the attackers, although the source of this information was not identified. On October 4, 2004, the seven inmates were served with infraction notices for the assault and were placed in 23-hour lock-in pursuant to a variance DOC obtained from the Board of Correction.[2] The Board granted this variance, which had no time limit, conditioned on DOC conducting a due process hearing for the inmates. DOC never sought or obtained a variance for petitioner.
Immediately after Abney’s death, in conjunction with DOC investigators, the Bronx District Attorney’s Office began an investigation which led to the indictment on November 3, 2004 of seven inmates, including petitioner, for manslaughter in the first degree and related charges.[3] At the request of the District Attorney’s Office, DOC did not proceed with infraction hearings against any of the indicted inmates, although the inmates continued to be held in lock-in status.
Although DOC neither sought a variance from the Board of Correction for petitioner nor served him with an infraction notice, on October 13, 2004 he was removed from general population and placed in the CPSU with a 23-hour lock-in. DOC failed to provide the court with any information regarding this change in petitioner’s status. There is nothing in the record that identifies who made the decision, why it was made, or whether it was a disciplinary or protective security measure. It was not until November 10, 2004, 27 days after his confinement, that petitioner received any notice as to his status.
On November 10th, DOC served petitioner with a written notice which unambiguously stated that it was a “predetention hearing notice.” It informed petitioner that he was being placed in predetention housing pending a disciplinary due process hearing for an infraction. Petitioner never received an actual infraction notice, as would be required by DOC rules before proceeding with a disciplinary hearing. On December 30, 2004, 11 weeks after petitioner was first placed in 23-hour lock-in, DOC afforded petitioner a hearing. For the first time, DOC classified *271 petitioner’s status as “protective custody with 23 hour lock-in per Board of Correction variance,” despite that DOC has acknowledged that there was no such variance. For the first time, petitioner was orally informed of the protective custody designation and told that a restrictive housing hearing was being held. He was not informed of the basis of his protective custody designation, nor had he previously been given any notice of that designation or the basis for it.
Notably, in the period prior to petitioner’s hearing, there were ongoing proceedings in the Bronx County Supreme Court pursuant to an article 78 petition brought by an indicted codefendant, similarly placed in 23-hour lock-in status. (See, People ex rel. Santiago v Warden, Rikers Is. Correctional Facility, 7 Misc 3d 321 [Sup Ct, Bronx County 2005, Bamberger, J.].)[4] 5Dur-ing the course of these proceedings involving Santiago, DOC elected to hold what it called a restrictive housing hearing, undoubtedly due to a concern that inmate Santiago might be released to general population in the absence of affording him such a hearing. Subsequent to the December 17, 2004 hearing provided Santiago, DOC went forward in petitioner’s case, absent any notice, with what it likewise classified as a restrictive housing hearing.
At petitioner’s December 30th hearing, the hearing officer orally informed petitioner that she was holding a restrictive housing hearing. Petitioner, who had no prior written notice, was not informed of the reasons for his placement in protective custody. The hearing officer merely informed petitioner that she would allow him to review the documents that she would be using to determine if his restricted housing status should be continued. She told petitioner she would give him an opportunity to tell her why he should not be in his current status. She did not inform petitioner that he could call witnesses or produce evidence at the hearing. Further, she did not make any evaluation of the need for petitioner to have assistance at the hearing. DOC presented no witnesses, choosing to rely solely on the documents submitted.[5]
*272 Although DOC designated petitioner’s housing as “protective custody,” none of the evidence submitted to the hearing officer contained any information that threats had been made to petitioner, either directly or indirectly. Nor did any of the documents submitted contain any evidence that petitioner had made threats to anyone, and none of the evidence demonstrated or even suggested that petitioner himself was a gang member or had any gang affiliation. The hearing officer, after allowing petitioner to review the documents, told him: “[W]e are not going to discuss anything about your case. We are just here for the protective custody status . . . .” Without telling petitioner the basis upon which DOC believed he should be restricted, the hearing officer asked: “[I]s there any reason why you feel you should not be in this status.” Petitioner responded: “[BJasically I have nothing to do with it.”
At the conclusion of the hearing, the hearing officer made a determination to continue petitioner’s protective custody status. The hearing officer provided no basis for that decision. In addition to the protective custody designation, the hearing officer noted that the 23-hour lock-in was “per a Board of Correction variance.” As noted earlier, the record made later in these proceedings shows that no such variance was issued for petitioner. DOC has offered no explanation for the basis of the hearing officer’s mistaken belief that she was continuing a status approved by the Board. The hearing officer’s determination was approved by the deputy warden 12 days later on January 11, 2005.
Since the hearing officer’s determination on December 30, 2004, DOC has conducted 28-day reviews of petitioner’s housing status as required by DOC regulations. After review hearings held on January 28 and on February 28, 2005, each new hearing officer upheld the initial protective custody determination. The only additional evidence produced at each of these reviews were police reports and videotapes containing statements of witnesses and codefendants related to petitioner’s participation in the homicide. DOC submitted no evidence at either review that there were threats made to or against petitioner and no evidence that *273 he had threatened anyone. At each review,[6] petitioner was given the same opportunity to examine the additional documentary evidence and he was asked if he wanted to remain in his restrictive housing status. He was not informed of his right to call witnesses or present evidence until the third hearing, in February, when, in response to a question by petitioner, the hearing officer told him that he could present documents and call witnesses. After each review, the hearing officers continued petitioner’s restriction to protective custody, wrongly designating it as “23 hour lock-in per Board of Correction variance.”
Petitioner filed a pro se writ of habeas corpus[7] that was heard at the Hikers Island Judicial Center on February 9, 2005. Adjournments were granted to allow DOC to obtain information and documents concerning petitioner’s housing status, and for petitioner to obtain counsel.[8] An amended petition was filed on March 22, 2005, DOC filed a verified answer and memorandum of law on April 1, 2005, and oral arguments were afforded the parties on April 8, 2005. The parties appeared before the court on April 22, 2005. At this hearing, DOC conceded that it had never obtained a variance for petitioner’s 23-hour lock-in status.
Findings and Legal Conclusions
Article 78 of the CPLR allows a challenge to any determination by a state agency made in violation of lawful procedure, or where the determination was arbitrary and capricious or an abuse of discretion. (CPLR 7803 [3].)[9] The court finds both that DOC violated its lawful procedures for restricting petitioner’s housing and acted arbitrarily and capriciously in confining him to his cell for 23 hours a day without obtaining the required *274 variance. Accordingly, the court orders petitioner’s release from 23-hour lock-in to the general population.
Petitioner argues that respondent failed to follow its own regulations for restricting petitioner’s housing by placing him in 23-hour lock-in without any prior notice, failing to conduct a hearing until 11 weeks after his placement, and never informing him of his rights at the hearing. He argues that the failure to provide the rights mandated by the regulations was not cured by the subsequent reviews. He also argues that there was no basis for his restriction in that there was no evidence of any gang affiliation or threats made by or against him.
Respondent argues that it made an administrative decision to place petitioner in restrictive housing for his own safety and that of other inmates and institutional staff. DOC insists that it has afforded petitioner all the due process that is constitutionally mandated. DOC also maintains that the 23-hour lock-in is the least restrictive alternative to adequately protect petitioner and others. DOC emphasizes that, although petitioner is housed .in the CPSU, his lock-in status is nonpunitive in that he continues to receive services and privileges.[10] Finally, DOC argues that it is not required to seek a variance from the Board of Correction for a 23-hour lock-in, that its authority is implicit in the regulations and that, in any event, this court has no jurisdiction to determine whether DOC violated minimum standards.
DOC’s Due Process Regulations
Petitioner was denied all protections afforded by DOC’s own rules. Petitioner was entitled to the due process rights promulgated in the DOC regulations, specifically, those detailed in New York City Department of Correction Directive 6005, which is entitled “Restrictive Housing Due Process.” Where an agency promulgates rules and extends greater due process rights than may be required by the Federal Constitution, it is without question that state law mandates that the agency follow its own rules. (Matter of Bryant v Coughlin, 77 NY2d 642, 647 [1991]; Matter of Garcia v LeFevre, 64 NY2d 1001 [1985].) To do otherwise is to act arbitrarily and capriciously (see, Matter of Cortez v Coughlin, 67 NY2d 907, 909 [1986], citing Matter of Garcia v LeFevre, supra), and mandates the annulment of the agency’s determination. (Matter of Bryant v Coughlin, 77 NY2d *275 at 649-650; accord, Matter of Dawson v Coughlin, 178 AD2d 946 [4th Dept 1991]; Matter of Hicks v Scully, 159 AD2d 624 [2d Dept 1990]; Matter of Lozada v Scully, 108 AD2d 859 [2d Dept 1985]; Matter of Grosvenor v Dalsheim, 90 AD2d 485 [2d Dept 1982].)
DOC’s reliance on Hewitt v Helms (459 US 460 [1983], overruled in part Sandin v Conner, 515 US 472 [1995]) in support of its argument that petitioner has been provided with constitutional due process is misplaced. Hewitt defined the minimum due process rights to be afforded sentenced prisoners in disciplinary proceedings as notice and an opportunity to be heard. In this case, petitioner’s due process rights were violated when DOC failed to give him the notice Hewitt mandates. In any event, it is clear that DOC violated petitioner’s rights under New York State law and for this reason the determination must be annulled.
DOC argues that its decisions regarding the safety and security of its institutions should not be second-guessed by this court, and cites cases for the principle that such decisions must be afforded great deference. The court acknowledges that DOC has broad discretion in its administrative decisions concerning the operation of its facilities to ensure the safety of its inmates and employees. Such deference is warranted where an agency follows its lawful procedures and its decisions are supported by substantial evidence. That is not the case here. By promulgating rules and regulations concerning the treatment of inmates, DOC has determined what process was due. DOC’s decision to abandon due process and violate its own procedures in petitioner’s case was arbitrary and capricious.
In Matter of Garcia v LeFevre (64 NY2d 1001 [1985]), the Court of Appeals annulled the decision of the New York State Department of Correctional Services (DOCS) following a disciplinary hearing. DOCS regulations provided inmates charged with violating prison rules with the right to call witnesses unless the hearing officer determined that to do so would jeopardize institutional safety or correctional goals. Without explanation, the hearing officer refused to allow the inmate to question a witness. The Court of Appeals held that the inmate had a right to the reason for the exclusion, and annulled the department’s determination for failure to follow one of its own rules. In the instant matter, DOC disregarded virtually all of its rules concerning petitioner’s involuntary restrictive housing placement.
*276 Significantly, since petitioner’s removal from general population on October 13th, DOC has inconsistently designated his status as both predetention and protective custody. Despite DOC’s lack of consistency on this issue, because DOC elected to proceed with a hearing on the protective custody designation, the court finds that petitioner was entitled to all of the rights specified in Directive 6005, including having a basis for placing him in that specific protective custody status.[11]
Directive 6005 sets forth the procedures to be followed before either involuntarily placing an inmate in restrictive housing for security reasons[12] or placing an inmate in predetention status pending a disciplinary hearing for an infraction.[13]
Directive 6005 requires that “[e]ither before or as soon as an inmate is involuntarily placed in a restrictive security assignment he . . . must be given written notice of the assignment.” (Directive 6005 [V] [B] [1]; 39 RCNY 1-02 [a] [1].) Where it is not possible to give notice before an inmate is transferred to restrictive security housing, the inmate may be transferred “prior to receiving written notice, provided that the inmate is served as soon after the transfer as it is practical to do so.” (Directive 6005 [V] [ B] [2].) The notice must describe “[t]he reasons for the designation . . . [t]he evidence relied upon . . . [t]he *277 inmate’s right to a hearing . . . and. . . . [t]he inmate’s rights at the hearing.” (Directive 6005 [V] [B] [1]; see also, Directive 4100R [IV] [C] [2]; 39 RCNY 1-02 [a] [1].) These rights include the “right to present documentary evidence,” and the “right to call both inmate and staff witnesses.” (Directive 6005 [V] [B] [3] [e], [f]; see, 39 RCNY 1-02 [a] [2] [iv].)
Petitioner was involuntarily removed from general population to the CPSU on October 13th. He received no written notice. It was not until 11 weeks later, at the December 30th hearing itself, that petitioner received oral notice that he was being given a restrictive housing hearing on a protective custody status. Constitutional due process, as well as DOC’s own rules, require adequate notice to ensure a meaningful opportunity to be heard. Without such notice, petitioner had no ability to challenge his change in status. Even at the hearing, petitioner was never told the reason for his designation as 23-hour lock-in protective custody. Without being given the basis for DOC’s determination, petitioner had no ability to adequately respond or to determine what witnesses he might call or what evidence he might produce. In any event, petitioner was never informed, either in writing or by the hearing officer, of his right to call staff and inmate witnesses and present evidence. Petitioner had initially been served with a predetention hearing notice, but was then told at the hearing that he was at a restrictive housing hearing. Obviously, the predetention notice informing him of an impending disciplinary hearing was no notice at all of either the protective custody designation or the restrictive housing hearing that was ultimately conducted.
On December 30th the hearing officer told petitioner that he was not to discuss the criminal case because the hearing was to address his protective custody status. However, no evidence was produced at the hearing to show the need for petitioner’s protection. Instead, the evidence consisted primarily of generalized statements regarding gang activity in prisons, and evidence regarding the homicide. It is not surprising then, that petitioner’s only response to why he should not be in protective custody status was a denial of involvement in the homicide.
The regulations also provide that “the hearing must be held no later than 48 hours after the inmate receives the written notice of the restrictive security designation.” (Directive 6005 [V] [B] [8]; see, 39 RCNY 1-02 [a] [5].) “Any extension beyond 48 hours must be minimized to prevent injustice by keeping an inmate inappropriately in restrictive security housing if such *278 placement lacks a reasonable basis. When an extension is granted, the hearing must be held on the first available weekday-following the extension.” (Directive 6005 [V] [B] [9].) DOC changed petitioner’s housing status and did not hold a hearing for 11 weeks. DOC neither sought an extension nor provided a reason for the 11-week delay.
Directive 6005 also requires that at the due process hearing, “[t]he Hearing Officer must ensure that the inmate has received copies of the written notice [and] that he . . . understands the contents.” (Directive 6005 [V] [B] [10].) At the December 30th hearing, petitioner was not asked if he received a copy of the required notice, and of course, none had been issued. “If the inmate is illiterate, [or] the case is very complicated . . . the inmate is entitled to assistance” and the hearing officer “may appoint a ‘counsel-substitute’ from the facility staff to assist the inmate.” (Directive 6005 [V] [B] [4]; see, 39 RCNY 1-02 [a] [3].) The hearing officer made no inquiry to ascertain whether petitioner was entitled to assistance at the hearing based on an evaluation of petitioner’s literacy or the complexity of the case.
In addition to the failure to provide petitioner with notice and the reason for the change in his housing status, DOC failed to provide petitioner with the basis for his continued status after the initial hearing. At the conclusion of a hearing, the hearing officer must decide if the evidence supports the inmate’s restrictive housing placement. “Unless there are exceptional circumstances, which must be documented in writing, the Hearing Officer must complete a written decision, together with findings of fact, within 24 hours from the conclusion of the hearing, excluding non-business days.” (Directive 6005 [V] [B] [12].) The hearing officer’s “report must articulate the decision and the reason for the decision, which must be based solely on evidence presented at the hearing.” (Id.)
To date, DOC has failed to provide the court with any report articulating the basis for the hearing officer’s decision following the December 30 hearing as required by the rules.[14] The one-page form, “Record of Due Process Hearing,” dated December 30, 2004, fails to set forth any findings of fact or the basis for the continuation of petitioner’s restrictive housing. Throughout these proceedings DOC has argued that petitioner’s placement was necessary to ensure his safety and the safety of other *279 inmates and staff. There is absolutely no indication that the hearing officer made any independent determination based on these considerations following the December hearing as required. In fact, the record of due process hearing merely states the following in a conclusory fashion: “Based on all information provided—which you had the opportunity to review, it is my determination you remain in PC (23 hr lock in) status.” (Record of due process hearing, Dec. 30, 2004.)
DOC also failed to follow its rule concerning the timing for review of the hearing officer’s determination to keep petitioner in restrictive housing. “Unless there are exceptional circumstances, which must be documented in writing, the [hearing officer’s] decision must be reviewed by the head of the facility . . . within 24 hours, excluding non-business days, and a final determination made.” (Directive 6005 [V] [B] [14].) The determination was not approved by the deputy warden until 12 days after the hearing officer’s December 30th decision.
DOC’s initial failure to provide petitioner with the due process required by its own regulations was not cured by the subsequent review hearings. At the January hearing, the hearing officer once again referred to the proceeding as a “predetention hearing.” Petitioner was not informed of his right to call witnesses and present evidence. Only in February, as an afterthought, was petitioner finally told that he could present evidence. Under Directive 6005 petitioner was entitled to the same rights at the later review hearings that he should have been afforded at the initial hearing.
The 23-Hour Lock-In
The DOC directives explicitly define the circumstances and procedures required for placing an inmate in any one of the restrictive housing designations, including protective custody. Twenty-three hour lock-in is never mentioned as a form of restrictive housing, even for inmates who pose the highest risk.[15] There is no explicit authority in the directives or regulation for confining an inmate to his cell for 23 hours a day. In fact, the only regulations that would seem to allow this confinement are *280 those governing punitive segregation where an inmate has been found guilty of an infraction and is housed in CPSU with a loss of privileges and services. (Directive 6500 [III] [C].)
To date, petitioner has been confined to his cell for 23 hours a day for over six months. Despite DOC’s insistence that this measure is not punitive because he has suffered no loss of privileges or services, the court notes that if DOC had proceeded with a disciplinary proceeding as initially intended, petitioner would already have served more than the maximum time authorized.[16] Instead, having classified petitioner’s confinement as one for his own protection, DOC takes the position that it can, at its discretion, confine petitioner to his cell indefinitely.[17]
DOC argues that the authority for a 23-hour lock-in is implicit in the restrictive housing regulations. However, the detailed procedures set out for all other involuntary housing changes, including those for maximum security and punitive segregation, contradicts DOC’s position. There is nothing in the regulations to suggest that a warden is vested with the discretion to impose such a severe restriction on protective custody inmates without any guidelines or procedures for its imposition. Indeed, the directive that controls the CPSU, where petitioner is housed, states otherwise. This directive explicitly incorporates the minimum standards and unambiguously states that inmates housed in the CPSU “shall not be deprived of any right/due process guaranteed by law, including those rights contained in the Minimum Standards” promulgated by the Board of Correction.[18] (Directive 4501 [II] [E].) The minimum standards promulgated by the Board of Correction sets eight hours *281 overnight, and two hours during the day, as the maximum period that an inmate can be involuntarily confined to a cell, and DOC is required to seek a variance from the board to deviate from this standard. (40 RCNY 1-06 [b].) Because Directive 4501 incorporates these minimum standards, and the minimum standards require an application for a variance, DOC violated its own rule by confining petitioner to his cell in excess of the maximum amount of time allowed without obtaining a variance.[19]
Significantly, based on the “Record of Due Process Hearing” forms completed after each hearing, each of the hearing officers mistakenly believed that petitioner’s 23-hour protective custody status was based on a Board of Correction variance. The hearing officers’ reliance on a variance that never existed could not have formed the basis of a valid determination regarding petitioner’s custody status, and their determinations were fatally flawed.
In sum, DOC failed to provide petitioner the due process mandated by its own regulations. Petitioner was entitled to written notice of his removal from general population either before his removal on October 13th or as soon as was practical. He was never given such notice. Petitioner was entitled to the reasons for his involuntary restrictive housing placement. He was never told the basis for his placement. Petitioner was *282 entitled to a hearing on the involuntary change in status within 48 hours. He received a hearing 11 weeks later. He was entitled to written notice of his rights at the hearing. He received no such notice. He was entitled to call witnesses and present evidence at the hearing. He was never informed of these rights until his third review hearing. Moreover, the rules governing petitioner’s confinement in the CPSU incorporated the minimum standards for confinement to a cell. That rule was not followed and a variance was not obtained.
Conclusion
Accordingly, DOC’s determination is annulled, petitioner’s application is granted, and DOC is directed to return petitioner to the general population.

. The court’s decision is based on all of the documents submitted to the court and oral arguments held in the article 78 proceeding, including a review of the evidence relied upon by DOC hearing officers in sustaining petitioner’s restrictive housing and lock-in status.

. The New York City Board of Correction promulgates minimum standards for New York City correctional facilities and sets eight hours overnight, and two hours during the day, as the maximum period that inmates can be involuntarily confined to their cells. (40 RCNY 1-06 [b].)

. One of the inmates initially named was not indicted.

. The court in that proceeding held that inmate Santiago’s 23-hour lock-in was invalid on multiple grounds, including DOC’s failure to provide Santiago with a timely hearing and to present substantial evidence at the hearing.

. These documents included, among other items, two memoranda from an assistant chief of special operations and the chief of facility operations, which related to general gang activity in prison and incidents unrelated to petitioner or his codefendants. It did provide information that four of the *272 codefendants were believed to be gang members. What the hearing officer termed a “Grand Jury Report” appears to have included the indictment and a Bronx County District Attorney’s Office voluntary disclosure form which summarized statements of codefendants, two of whom implicated petitioner in the attack.

. This court did not review the audiotapes of the March and April review hearings because the hearings were conducted subsequent to the filing of the amended article 78 petition.

. Because petitioner was not being released from custody but was only challenging DOC’s determination concerning his housing status, the parties agreed to convert the writ to an article 78 petition.

. The Legal Aid Society, which had been assigned at the Judicial Center, asked to be relieved based on a potential conflict with codefendant Santiago, whom they represented in the article 78 proceeding before Justice Bamberger.

. A determination made by a state agency after conducting a hearing may also be challenged on the grounds that it was not supported by substantial evidence. (CPLR 7803 [4].) Petitioner argues that DOC produced no substantial evidence to support his protective custody designation. The court does not reach this issue because the court’s decision on procedural grounds terminates the proceeding. In any event, CPLR 7804 (g) would require issues of substantial evidence to be transferred to the Appellate Division for disposition.

. Petitioner does not dispute that privileges and services have been provided.

. Although DOC argues that petitioner’s status has always been that of protective custody, there is no document that supports that position. In fact, this position has been contradicted several times during petitioner’s restrictive housing placement. Aside from the November 10th predetention hearing notice served on petitioner, a January 27, 2005 memo from the assistant chief of special operations to the warden of the facility indicates that petitioner remains a security risk and should remain in prehearing detention. Even the hearing officer at the January review deemed petitioner to be in predetention status numerous times. (See, record of due process hearing, dated Jan. 31, 2005; mem decision, Feb. 1, 2005, Maximo, H.O.)

. Directive 6005 and 39 RCNY 1-02 (a) govern the rights afforded inmates who are involuntarily placed in restrictive housing. The guidelines for the specific restrictive housing classifications are found in New York City Department of Correction Directive 4100R, Special Housing Guidelines Classification (Appendix A.)

. Directive 6500 governs the procedures for disciplinary hearings and sets forth the rights of an inmate and the loss of privileges for violating any of the institution’s rules. Predetention hearing status refers to an inmate housed in administrative segregation pending a disciplinary hearing where the inmate is believed to be a threat to the personal safety, order and security of the facility. (Directive 6500 [III] [A] [10].) These inmates are not in a punishment status and are afforded due process as a part of the disciplinary hearing process. (Directive 6500 [III] [A] [10]; Directive 6005 [III] [C].) Although Directive 6500 is silent as to the length of time an inmate may remain in this status, it is clear that the status is not indefinite and would end with the resolution of the disciplinary hearing.

. In contrast, the hearing officers at both the January and February reviews, in addition to completing the form, prepared memoranda detailing their findings, as required by the regulations.

. Inmates who are deemed an immediate threat to security, including those awaiting disciplinary hearings, can be placed in administrative segregation. Those inmates who pose an immediate threat to security due to highly assaultive behavior, evidence of escape attempts or involvement of high level criminal enterprise may be placed in maximum security. (Directive 4100R, Appendix A.)

. For the most serious infraction, an inmate can be housed in the CPSU with the loss of all privileges for up to 90 days for each disciplinary charge. (39 RCNY 1-03 [b] [4]; Directive 6500 [III] [C] [4].)

. The court does not reach the question of whether confining a pretrial detainee in a cell for 23 hours a day for over six months is punitive and violates the New York State Constitution. In determining whether an inmate’s due process rights have been violated, the State Constitution would mandate that a court balance the harm to petitioner resulting from the confinement, against the benefit sought by the government. Such a balance necessarily would include an analysis of whether, in fact, there were less restrictive alternatives, such as separation orders, that could have accomplished the same benefit sought here. (See, Cooper v Morin, 49 NY2d 69 [1979], cert denied 446 US 984 [1980].)

. Citing Powlowski v Wullich (102 AD2d 575 [4th Dept 1984]), DOC argues that the court has no jurisdiction over the enforcement of the minimum standards and that petitioner has no “private right of action” if DOC violates these standards. Powlowski was a class action seeking broad directives and a declaration that county prison administrators were bound by min *281 imum standards set by New York State. While the Powlowski court noted that the minimum standard established by the State was not necessarily the minimum standard that was constitutionally acceptable, the Court distinguished that case from cases, like petitioner’s case, where there is a specific claim of injury to an individual or a violation of a right that was guaranteed by the prison’s own rules. (Powlowski, 102 AD2d at 583 n 4.)

. DOC’s current position that it need not seek a variance to place an inmate in 23-hour lock-in is contradicted by its own actions. Its position appears to stem from the realization that DOC mistakenly did not seek a variance for petitioner, although it did obtain a variance for the seven inmates initially identified in the attack. DOC’s actions in applying for and obtaining this variance demonstrates its view that a variance was needed to impose such a restriction. Although there is no question that this variance did not include petitioner, by letters dated January 31 and February 7, 2005, DOC mistakenly requested a limited variance to modify the October 4 variance as to petitioner. DOC has submitted a letter dated March 7, 2005, which purportedly withdraws its request for a variance, but the letter neither refers to petitioner nor acknowledges the error, and DOC did not acknowledge the error until after these proceedings began. Despite the March 7 letter purportedly withdrawing the erroneous request for a variance, another “Record of Due Process Hearing,” dated March 28, 2005, once again notes that petitioner’s 23-hour continued protective custody status was based on a Board of Correction variance.