■ In the Matter of Mark Shuman, Petitioner, v New York State Racing and Wagering Board, Respondent. [835 NYS2d 569]—

Determination of respondent, Racing and Wagering Board, dated October 25, 2004, which, after an evidentiary hearing, found that petitioner had violated the Board's drug and medication rules and imposed a 30-day suspension of his thoroughbred trainer's license, confirmed, the petition denied and the proceeding (transferred to this Court by order of the Supreme Court, New York County [Rolando T. Acosta, J.], entered July 25, 2005) dismissed, without costs.

It is well established that judicial review of an administrative determination is limited to consideration of whether or not that determination is supported by substantial evidence (*300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 179 [1978]; *Matter of Vallebuona v Kerik*, 294 AD2d 44, 50 [2002]), and the issue of whether substantial evidence exists to support the agency's findings is a question of law for the courts (*300 Gramatan Ave. Assoc.*, 45 NY2d at 181; *Matter of Goldsmith v DeBuono*, 245 AD2d 627, 628 [1997]). Substantial evidence, which has been described as a "minimal standard" (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 188 [1998]; *Matter of Joseph v Johnson*, 27 AD3d 563 [2006]), or as constituting a "low threshold" (*Matter of Patricia Ann Cottage Pub, Inc. v Mermelstein*, 36 AD3d 816, 818 [2007]), must consist of such relevant proof, within the whole record, "as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (*300 Gramatan Ave. Assoc.*, 45 NY2d at 180; *see also Matter of Star Rubbish Removal Corp. v Martinez*, 15 AD3d 587, 588 [2005]). The Court of Appeals has noted that substantial evidence "requires less than 'clear and convincing evidence' . . . , and less than proof by 'a preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt' " (*FMC Corp.*, 92 NY2d at 188, quoting *Matter of Carriage House Motor Inn v City of Watertown*, 136

AD2d 895, 895 [1988] and *300 Gramatan Ave. Assoc.*, 45 NY2d at 180-181). Indeed, "as a burden of proof, it demands only that 'a given inference *is reasonable and plausible, not necessarily the most probable*' " (*Matter of Miller v DeBuono*, 90 NY2d 783, 793 [1997], quoting Borchers and Markell, New York State Administrative Procedure and Practice § 3.12, at 51 [1995] [emphasis added]; *see also Matter of Berenhaus v Ward*, 70 NY2d 436, 443-444 [1987]), and the courts may not weigh the evidence or reject the conclusion of the administrative agency where the evidence is conflicting and room for choice exists (*Berenhaus*, 70 NY2d at 444; *Matter of Stork Rest. v Boland*, 282 NY 256, 267 [1940]; *Matter of Acosta v Wollett*, 55 NY2d 761 [1981]; *Matter of Verdell v Lincoln Amsterdam House, Inc.*, 27 AD3d 388, 390 [2006]).

In the matter before us, petitioner Mark Shuman, a thoroughbred trainer licensed by respondent, was found, after an administrative hearing, to have violated Racing and Wagering Board Rules (9 NYCRR) § 4043.2 (former [f], now [i]), in that a horse trained by him, Askara, had its right ankle aspirated in conjunction with a steroid drug within five days of a race at Belmont Park, and § 4043.4, which imposes strict responsibility on the trainer to ensure that a horse in his or her care does not receive any drug or other restricted substance within certain specified periods prior to a race (*Matter of Mosher v New York State Racing & Wagering Bd.*, 74 NY2d 688, 690 [1989]; *Matter of Pletcher v New York State Racing & Wagering Bd.*, 35 AD3d 920, 922 [2006]). Petitioner subsequently commenced this CPLR article 78 proceeding to annul the Board's findings, asserting, inter alia, that the determination was not supported by substantial evidence.

The evidence educed at the hearing included the treatment record of Dr. Leonard Patrick, the veterinarian who treated Askara during the relevant time frame. The record indicates that four days prior to the race in question, Askara was injected with, among other drugs, Depo-Medrol (Depo) and MAP-5. Dr. Patrick's treatment record was originally forwarded by petitioner's brother, who worked as a business manager for the horse's owner, to the Belmont Park stewards in conjunction with a different investigation concerning another drug.

Dr. George Maylin, who the parties stipulated was, in the words of petitioner's counsel, the "foremost [expert] in the world" on the issue of equine drug pharmacology, testified that Depo was a Board-regulated cortical steroid, and that MAP-5 is a hyaluronic acid derivative which is used as "a joint fluid lubricant. It is to mimic the normal fluid of joints." The follow-

ing exchange also took place between respondent's counsel and Dr. Maylin:

"Q. With regard to the—I am just going to call it depo, with regard to that, the entry in the records, is there a board rule that is implicated by that record entry?

"A. Yes.

"Q. And what would that be?

"A. The board rule states that joints cannot be aspirated or injected within five days of the start of a racing program. This would be, I guess, four days."

Petitioner testified that Dr. Patrick's treatment record was false and was concocted at the request of the Belmont Park stewards, because they were either conspiring against him or the horse's owner. Petitioner further testified that he maintained his own medication and treatment records for the horses he was training but that he had already discarded the documents pertaining to Askara because she had been claimed (sold) prior to the hearing. The Administrative Law Judge (ALJ), however, pointed out that each daily treatment record generated by petitioner had a number of horses and their medications listed on it, so that if, as petitioner claimed, Askara's records were destroyed, then the records for the other horses would have, likewise, been destroyed. Petitioner was unable to explain or directly address the Judge's observation, instead noting that "the only reason there would be a need for her records would have been for a hearing such as this." Finally, in one article published by the New York Post, when asked about the alleged aspiration of the ankle, petitioner purportedly stated "[t]hey're going by the vet's billing record, showing it was four days, but it was done five days out." In a second article released by the Associated Press, the exact quote is attributed to petitioner, although the article does not mention whether Askara's ankle was aspirated, just that she was injected with a steroid within the five-day limit. When confronted with the press items at the hearing, petitioner contended he did not remember making the statements.

The ALJ, in rendering his decision, found petitioner's testimony to lack credibility, noting the existence of "several unexplained inconsistences between his testimony and the documentary evidence." The ALJ thereafter found petitioner responsible for violating Board Rules §§ 4043.2 and 4043.4.

Initially, we note that the ALJ has the power to resolve credibility issues and we find no basis herein to disturb those findings (*see Matter of Nuzzo v Horn*, 25 AD3d 342, 343 [2006];

*Matter of Asaro v Kerik*, 299 AD2d 196 [2002]). Moreover, the evidence presented at the hearing was sufficient to meet " 'the very minimal evidentiary requirement' " of substantial evidence necessary to uphold respondent's determination (*Matter of Perlov v Kelly*, 21 AD3d 270, 271 [2005], quoting *Matter of Scully v Safir*, 282 AD2d 305, 308 [2001]). Dr. Patrick's treatment record clearly states that Askara was injected with Depo-Medrol, a cortical steroid, and MAP-5, which Dr. Maylin stated was a drug designed to mimic the normal fluid of joints. In our view, this is sufficient for a reasonable mind to infer that the fluid in Askara's ankle had been drained, or aspirated, and replaced with the synthetic fluid, as there appears to be, from Dr. Maylin's testimony, no other reason why MAP-5 would have been utilized on the horse's ankle other than to replace the normal joint fluid. The foregoing, coupled with petitioner's lack of candor, unsupported conspiracy theories, and inability to explain where his records for Askara are, or why they were destroyed along with the records of the many other horses he was training, all support the Board's determination.

We note that the treatment record of the veterinarian was properly admitted into evidence and relied upon by the ALJ. Even assuming arguendo that such record was hearsay, not only did petitioner fail to object to its admission, but hearsay is properly admissible in administrative proceedings, and "if sufficiently relevant and probative may constitute substantial evidence" (*People ex rel. Vega v Smith*, 66 NY2d 130, 139 [1985]; *see also Matter of Foster v Coughlin*, 76 NY2d 964, 966 [1990]).

The dissent, in our view, has misconstrued this Court's review function and improperly embarked on a de novo review of the facts, substituting its judgment for that of the agency (*see Matter of K & M Turf Maintenance [Gallo]*, 166 AD2d 445, 447 [1990]; *Matter of C. K. Rehner, Inc. [City of New York]*, 106 AD2d 268, 270 [1984]). The record, taken as a whole, is more than sufficient to support an inference, which must be reasonable and plausible, but not necessarily the most probable (*Miller*, 90 NY2d at 793), that Askara's ankle was aspirated. Further, this case, based upon inferences garnered from the record, must be reviewed in light of the well-settled proposition that the determination of an agency, acting pursuant to its authority and within its area of expertise, is entitled to great deference (*Matter of Finger Lakes Racing Assn., Inc. v State of N.Y. Racing & Wagering Bd.*, 34 AD3d 895, 897 [2006] [great deference is to be accorded to the Racing and Wagering Board in overseeing horse racing]; *see also Matter of Tockwotten Assoc. v New York State Div. of Hous. & Community Renewal*, 7 AD3d 453, 454 [2004];

*Matter of Nelson v Roberts*, 304 AD2d 20, 23 [2003]). Finally, we disagree with the dissent that an evidentiary gap exists sufficient to warrant annulling the Board's determination and vacating the penalty imposed, and again point out that it was petitioner who admittedly destroyed his own medication and treatment records for Askara, and was unable to explain and refused to directly address the question of why he did so, other than to state, somewhat paradoxically, that the only need for such records would be a hearing. Concur—Tom, J.P., Andrias, Marlow and Nardelli, JJ.

McGuire, J., dissents in a memorandum as follows: Respondent, the state administrative agency charged with, among other things, overseeing horse racing activities (Racing, Pari-Mutuel Wagering and Breeding Law § 101 [1]), found that petitioner, a licensed trainer of thoroughbred race horses, violated a rule promulgated by respondent prohibiting a horse that has had a joint aspirated in conjunction with a steroid injection from racing for at least five days following such procedure (9 NYCRR 4043.2 [former (f)]).[1] Specifically, respondent determined that one of the ankles of a horse, Askara, trained by petitioner had been aspirated in conjunction with a steroid injection four days before competing in a race at Belmont Park. Based on its finding that petitioner violated that regulation, respondent determined that he violated a separate regulation, the "trainer responsibility rule," which places responsibility on a trainer to ensure that a horse in his or her custody, care or control does not receive any drug or other restricted substance within specified periods before a race (9 NYCRR 4043.4; *see Matter of Casse v New York State Racing & Wagering Bd.*, 70 NY2d 589, 594 [1987]). Respondent suspended petitioner's thoroughbred trainer's license for 30 days. Petitioner commenced the instant CPLR article 78 proceeding challenging respondent's determination, asserting that respondent's conclusion that Askara had a joint aspirated in violation of 9 NYCRR 4043.2 (former [f]) was not supported by substantial evidence.[2] I agree and would grant the petition, annul the determination and vacate the penalty.

Petitioner was found to have violated a regulation prohibiting "a horse which has had a joint aspirated (in conjunction with a steroid injection) . . . [from] rac[ing] for at least five days fol-

---

1. Now 9 NYCRR 4043.2 (i).
2. Petitioner's lone argument in support of vacatur of the finding that he violated the "trainer responsibility rule" (9 NYCRR 4043.4) is that he did not violate 9 NYCRR 4043.2 (former [f]).

lowing such procedure" (9 NYCRR 4043.2 [f]).[3] The term "aspirate" is defined as "to draw by suction"; "to remove material by aspiration [i.e., by means of suction]" (Webster's Third New International Dictionary 130 [1986]). At the hearing, respondent presented the testimony of Dr. Maylin, an expert in the field of equine pharmacology, who, based on a record of the substances administered to Askara, opined that the horse was given a steroid injection, i.e., "depo," a cortical steroid, in one of its ankles four days before racing. However, the expert did not state, opine or even suggest that the ankle was aspirated in conjunction with the injection. Nor did the record of the substances administered to Askara or the testimony of the other witness called by respondent, one of its investigators, indicate that the ankle or any joint had been aspirated in conjunction with the injection.

According to the majority, Dr. Maylin's testimony that MAP-5 mimics the normal fluid of joints "is sufficient for a reasonable mind to infer that the fluid in Askara's ankle had been drained, or aspirated, and replaced with the synthetic fluid, as there appears to be, from Dr. Maylin's testimony, no other reason why MAP-5 would have been utilized on the horse's ankle other than to replace the normal joint fluid." What "appears to be" an inference to the majority is sheer speculation on a matter that is beyond its competence. Dr. Maylin did not testify that replacing joint fluid is the sole or even the principal reason to administer MAP-5. Indeed, Dr. Maylin gave no testimony bearing on the reasons veterinarians or trainers administer MAP-5. But even assuming, despite this evidentiary gap, that replacing joint fluid is the sole or principal reason to administer MAP-5, Dr. Maylin did not testify that aspirating an ankle is the sole or even the principal reason for the loss of normal joint fluid. Indeed, Dr. Maylin gave no testimony bearing on the reasons a horse might lose some of the fluid in an ankle. If Dr. Maylin had testified that in his expert opinion the only rational reason to administer MAP-5 was to replace fluid that had been aspirated, the requisite substantial evidence might have been supplied.[4] What the majority considers a reasonable inference is no substitute for such an expert opinion (see Matter of Morrissey v Sobol, 176 AD2d 1147, 1150 [1991], lv denied 79 NY2d 754

3. At the conclusion of respondent's case before the hearing officer, petitioner moved to dismiss this charge on the ground that respondent failed to establish that Askara had been aspirated. Thus, contrary to respondent's contention, this issue is preserved for our review.

4. Even then, another evidentiary gap would need to be bridged. After all, it would not necessarily follow that the injection of MAP-5 occurred on the same day as the aspiration of the ankle.

[1992]; *Matter of Klein v Sobol*, 167 AD2d 625, 629 [1990], *lv denied* 77 NY2d 809 [1991]).

Moreover, on this record, we may not assume that respondent utilized its expertise and found that a joint was aspirated. While an administrative agency, in performing its adjudicatory functions, "may permissibly question witnesses and use its expertise to analyze and interpret the testimony elicited, it may not use that expertise as a substitute for evidence" (*Matter of Weisenthal v New York State Bd. of Regents*, 249 AD2d 712, 715 [1998], *lv denied* 92 NY2d 808 [1998], citing *Matter of Cohen v Ambach*, 112 AD2d 497, 498 [1985]). No evidence was adduced at the hearing that, as respondent asserts, a steroid injection into a joint is always accompanied by aspiration.

The majority's reliance on what it characterizes as "petitioner's lack of candor, unsupported conspiracy theories, and inability to explain where his records for Askara are, or why they were destroyed along with the records of the many other horses he was training," is misplaced. At most, this evidence tends to show a consciousness of guilt. It does not negate the absence of any evidence of an essential element of the offense (*People v Leyra*, 1 NY2d 199, 209-210 [1956] ["And our court has held that evidence of fabrication or other evasive conduct may not serve as a substitute for other proof, that it operates ordinarily *only by way of lending strength to other and more tangible evidence*" [internal quotation marks and citations omitted]). Finally, and it is not clear the majority believes otherwise, the statements petitioner made that were reported in the press articles the majority cites cannot rationally be considered as admissions or other evidence that the ankle was aspirated.

The majority apparently believes that fundamental precepts governing judicial review of administrative determinations are at stake on this appeal. After all, it asserts that "the dissent . . . has misconstrued this Court's review function and improperly embarked on a de novo review of the facts, substituting its judgment for that of the agency." But this assertion is overheated, just as overheated as the opposite assertion—that the majority has abdicated its review function—would be. The prosaic reality is that the disagreement here is on a narrow, fact-bound issue: whether it reasonably can be inferred from the evidence that Askara's ankle was aspirated within the particular time period during which such a procedure was impermissible. The majority does not address the specifics of any of the evidentiary gaps in Dr. Maylin's testimony. In my view, those gaps were not bridged by any other evidence at the hearing, and can neither be bridged by reasonable inferences nor obscured by the elementary principles the majority invokes.

In light of the complete absence of evidence that one of Askara's joints was aspirated, respondent's determination was not supported by substantial evidence (*see* CPLR 7803 [4]). Accordingly, I would grant the petition, annul the determination and vacate the penalty.