McCarthy, J.P.
(dissenting). I agree with the majority that if the dates found on veterinary records[1] regarding specified forms of veterinary care represent the dates upon which such *1248 treatment was administered, those records, along with other evidence, chronicle 1,717 violations by petitioner of rules prohibiting the administration of specified substances to a horse within specified windows prior to a race. The majority, however, finds that a reasonable mind cannot reach the conclusion that those dates convey when treatment occurred. As a result, the majority annuls the entirety of respondent’s determination. In contrast, I find that the inference that respondent made that the dates listed next to specified veterinary care represent the dates that such care was administered to be reasonable and plausible. That conclusion requires confirmance and, accordingly, I respectfully dissent.
Absent some other infirmity, this Court is bound to confirm respondent’s determinations regarding petitioner’s violations if they are supported by substantial evidence, that is if the evidence supporting those determinations is that which “a reasonable mind may accept as adequate to support [the relevant] conclusion[s] or ultimate fact[s]” (Matter of Shuman v New York State Racing & Wagering Bd., 40 AD3d 385, 385 [2007] [internal quotation marks and citation omitted]). Substantial evidence is a minimal standard that requires less than evidence beyond a reasonable doubt, less than overwhelming evidence, less than clear and convincing evidence and less than proof by a preponderance of the evidence (see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 188 [1998]; Matter of Shuman v New York State Racing & Wagering Bd., 40 AD3d at 386). Substantial evidence “demands only that a given inference is reasonable and plausible, not necessarily the most probable” (Matter of Miller v DeBuono, 90 NY2d 783, 793 [1997] [internal quotation marks omitted]; see Matter of Shuman v New York State Racing & Wagering Bd., 40 AD3d at 386). Where “room for choice” exists in the inferences to be drawn from evidence, this Court has no power to preference its own interpretation over that of the administrative agency tasked with the determination (see Matter of Berenhaus v Ward, 70 NY2d 436, 444 [1987] [internal quotation marks and citation omitted]). This great deference accorded to such an agency determination derives from the Legislature’s decision to task an agency with expertise in the relevant law and regulations—rather than a court of general jurisdiction that lacks such expertise—with the authority to initially resolve legal disputes (see Matter of Shuman v New York State Racing & Wagering Bd., 40 AD3d at 388; Matter of Finger Lakes Racing Assn., Inc. v State of N.Y. Racing & Wagering Bd., 34 AD3d 895, 897 [2006], lv denied 8 NY3d 810 [2007]).
The proof relevant to the interpretation of the veterinary *1249 records consisted of expert proof regarding the customary practice of veterinarians, the records themselves and the proof regarding petitioner’s admissions regarding veterinary treatment. At the hearing, Joel Leveson, the director of investigations for respondent, was found qualified to testify as an expert on “the use of equine medication and the illegal use of equine medication.”[2] In describing his professional work, Leveson explained that he dealt with veterinarians “every day.” Leveson further testified that he was familiar with the customary practice of veterinarians and that veterinarians treating standard bred horses customarily created records recording the drug that was administered to a horse and the date upon which it was administered. Thus, when respondent considered veterinary records and found that dates listed next to descriptions of veterinary care represented dates upon which such care was administered, it relied on expert evidence establishing that such an interpretation was consistent with customary practice within the veterinary industry.
Turning to the veterinary records[3] themselves, the records are prefaced by a cover letter that explains that the dates contained within the records represent “the day that a treatment was prescribed, horse was treated or medication dispensed for the horse.” Contrary to the majority’s description of the records, however, this is not the only context for the individual record entries. Each dated entry for a horse’s “chronological history” is accompanied by a description/ comments section containing further information. For example, the records indicate an entry for the horse Blue Bird Dream on December 15, 2010 with the comment/description of “treatment with Bute/Robaxin complex for musculoskelatal [sic] infl.” An ordinary meaning of the term “treatment” is “an instance of treating someone or something,” which would indicate that the records chronicled an instance of Blue Bird Dream being treated with Robaxin (Merriam-Webster Online Dictionary, treatment [http://www.merriam-webster.com/dictionary/ treatment] [accessed Oct. 4, 2016]). Similarly, the description/ comments section for Blue Bird Dream’s veterinary care occur *1250 ring on January 11, 2011 notes “injection” and then describes a substance. An ordinary meaning of “injection” is “an act or instance of injecting,” which would indicate that Blue Bird Dream received an injection on that date (Merriam-Webster Online Dictionary, injection [http://www.merriam-webster.com/ dictionary/injection] [accessed Oct. 4, 2016]). With this in mind, in order for the majority to reach its conclusion, it necessarily finds that no reasonable mind could conclude that “treatment” meant that a horse was treated or that “injection” meant that a horse was injected. I disagree since a reasonable mind could reach such conclusions by ascribing those terms their plain meanings.
More generally, an examination of the records provides a reasonable basis to conclude that the veterinarian’s default record-keeping practice was in accordance with custom: dates associated with care represented the administration of care unless otherwise specified. For example, Blue Bird Dream raced on October 14, 2010. The veterinary records contain an entry for Blue Bird Dream for the next day, October 15, 2010. The description/comments state “race performance exam.” Notably, the description/comments do not explicitly state whether an exam was administered, prescribed or dispensed. Nonetheless, a reasonable mind would conclude that an exam actually occurred on that day, as it would be absurd to conclude that an exam was prescribed or dispensed.
As a second example indicating that the veterinarian’s default procedure was to record the date that care was administered, the horse Vertical Horizon has a single “chronological history” entry for January 22, 2011 with the description/ comments “Larynx . . . acupuncture.” Turning to the veterinary billing records, Vertical Horizon has a single billing entry for January 22, 2011 with the note “inject throat.” The billing records corroborate that, despite the fact that the veterinary records did not explicitly specify that “Larynx . . . acupuncture” was care administered on the date indicated, such treatment was administered rather than prescribed or dispensed. From the aforementioned examples, a reasonable mind could conclude that the veterinarian’s default record-keeping procedure, consistent with customary practice within the industry, recorded the dates of the administration of care unless otherwise specified in the description/comments.[4]
Finally, Leveson’s recorded phone call with petitioner offers further proof substantiating that the veterinary records re *1251 corded dates of actual treatment as well as independent proof supporting all of the violations regarding the administration of glycopyrrolate-robinul. During that conversation, petitioner explained that “when the horses train, they get treated,” and when asked to explain what training meant, he explained that training is “a workout.” Petitioner then described that such workouts occurred “[three] days out.” Thereafter, petitioner agreed that “robinul and robaxin” were given to the horses on the same day as one another, and when Leveson then stated “[three] days away from the race. Am I saying the right thing?”, petitioner replied “ye[s].” Undoubtedly, room for choice exists as to the interpretation of this phone call, but a reasonable mind could conclude that petitioner acknowledged administering robinul and robaxin to his horses three days prior to their respective races, which would necessarily amount to patent violations of the ban on administering robinul within 96 hours of a race (see 9 NYCRR 4120.2 [g] [8]).
More generally and more importantly, the phone conversation provides further proof supporting the conclusion that the relevant veterinary record entries recorded dates upon which treatment was administered. What is unambiguous about the phone conversation is petitioner’s acknowledgment that the horses were treated with robinul and robaxin in the lead-up to races. That acknowledgment accords with respondent’s conclusion that the relevant dates in the veterinary records represented treatment dates given that the dates associated with robaxin treatment entries often preceded the respective horses’ races by less than three days.[5]
The foregoing proof provides substantial evidence to support respondent’s determination (see Matter of Case v New York State Racing & Wagering Bd., 61 AD3d 1313, 1314 [2009], lv denied 13 NY3d 705 [2009]; Matter of Shuman v New York State Racing & Wagering Bd., 40 AD3d at 388; Matter of Dutrow v New York State Racing & Wagering Bd., 18 AD3d 947, 947-948 [2005]; Matter of Sachs v New York State Racing & Wagering Bd., Div. of Harness Racing, 1 AD3d 768, 772 [2003], lv denied 2 NY3d 706 [2004]). Respondent made eminently reasonable determinations in evaluating the proof, making factual findings and reaching its determination. Since *1252 room for choice existed as to the inferences to draw from the proof provided and respondent made reasonable and plausible inferences, this Court has no power to replace respondent’s conclusions with ones that it would prefer. Accordingly, and considering that petitioner’s remaining arguments are also without merit, I would confirm respondent’s determination.
Adjudged that the determination is annulled, without costs, and petition granted.

. Two distinct forms of veterinary records were submitted into evidence. The first set of records provides a “chronological history” for each horse that the veterinarian cared for, which ascribed dates to noted forms of veterinarian care. The second set of records provided billing information for each horse cared for with dates and prices being ascribed to a description of the veterinary service provided. Generally, by comparing the dates in the two forms of records, one can also compare the descriptions of the care/service provided. Considering the different information provided in each set of records in regard to the descriptions associated with dated entries, the records often provide supplemental information to one another in elaborating the care provided to a horse on a particular day.

. Leveson gave lengthy testimony regarding his qualifications, relating to his current job, his work in the horse-racing industry and his having been “a professional horseman from age [18].”

. The relevant veterinarian was located in New Jersey. Notably, licensed veterinarians in New Jersey are legally required to ensure that patient records “accurately reflect the treatment or services rendered” (NJ Admin Code § 13:44-4.9 [a]). A reasonable mind could find, as a general matter, that a person legally charged with a duty to maintain accurate records is more likely to do so than someone without such a duty.

. None of the charges at issue are based on veterinary records specifying a form of veterinary care that was a prescription or a dispensement.

. In contrast, it makes little sense to conclude that the veterinarian records would record that a veterinarian was consistently prescribing treatments during prohibited windows for substances intended to be administered after a race. This is particularly true given that veterinary records show repeated entries for care on days immediately following a race, in which such prescriptions could have been provided if they were intended to be administered after the race and outside of a prohibited window.